IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM G. MOORE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 92-2288 (BAH) |
| v. | ) | (Consolidated with Civil Action |
| | ) | No. 93-0324 (BAH)) |
| MICHAEL HARTMAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| WILLIAM G. MOORE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 93-0324 (BAH) |
| | ) | (Consolidated with Civil Action |
| v. | ) | No. 92-2288 (BAH)) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF WILLIAM G. MOORE, JR.'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF HIS MOTION FOR A NEW TRIAL**

Amy Dias
Christian G. Vergonis
Charles T. Kotuby, Jr.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
(202) 626-1700 (fax)

Richard H. Deane Jr.
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3053
(404) 581-8502

Paul Michael Pohl
JONES DAY
One Mellon Bank Center
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
(412) 394-7959 (fax)

*Counsel for Plaintiff
William G. Moore, Jr.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

ARGUMENT ............................................................................................................... 1

I.    SEVERAL LEGAL ERRORS, SEPARATELY AND IN COMBINATION, AFFECTED MOORE'S SUBSTANTIAL RIGHTS ....................................................... 2

    A.    The Court Prejudicially Erred in Excluding Indemnification Evidence and Allowing Defendants To Mislead the Jury About Their Financial Exposure ................................................................................................... 2

    B.    The Court Abused Its Discretion in Allowing Defendants Six Peremptory Challenges to Moore's Three ................................................................. 6

    C.    The Court Erred By Not Giving an Instruction on Concerted Action ................... 7

    D.    The Court Erred in Admitting and Then Failing To Limit the Use of Hearsay Evidence Relevant to Retaliatory Intent and Probable Cause .............. 13

    E.    The Probable Cause Instruction Was Inadequate in Critical Respects ............... 20

    F.    The Court Erred in Excluding Judge Revercomb's Opinion .............................. 23

    G.    The Court's Inducement Instruction Was Incorrect ........................................... 23

    H.    The Court Should Have Excluded Irrelevant, Inflammatory Evidence About the Race-Based Admissions of Moore's Country Club .......................... 26

    I.    The Court Erred in *Sua Sponte* Delivering Improper Instructions the Jury That Undermined the Effectiveness of Moore's Case ........................................ 29

II.   THE JURY'S VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE ............ 32

    A.    The Jury's Verdict on Retaliatory Motive Is Against the Great Weight of the "Smoking Gun" Evidence Adduced by Moore .............................................. 33

    B.    The Jury's Verdict on Inducement Is Both Irrelevant and Against the Great Weight of the Evidence ........................................................................ 37

    C.    The Jury's Verdict on Probable Cause Is Against the Great Weight of the Evidence and Is Also Wrong as a Matter of Law ............................................. 39

CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES[*]

**Page**

**CASES**

*Am. Heartland Port, Inc. v. Am. Port Holdings, Inc.*,
    2014 U.S. Dist. LEXIS 88374 (N.D. W. Va. June 30, 2014) ................................28

*Ashcraft & Gerel v. Coady*, 244 F.3d 948 (D.C. Cir. 2001) ................................5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................9

*\*Betts v. City of Chicago*, 784 F. Supp. 2d 1020 (N.D. Ill. 2011) ................................2

*\*Bird v. Glacier Electric Coop. Inc.*, 255 F.3d 1136 (9th Cir. 2001) ................................29

*Brennan v. William Paterson College*,
    No. 11-6101, 2014 U.S. Dist. LEXIS 99781 (D.N.J. July 23, 2014) ................................9

*\*Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010) ................................23

*\*Caudle v. District of Columbia*, 707 F.3d 354 (D.C. Cir. 2013) ................................5, 30, 31

*Cervantes v. Jones*, 188 F.3d 805 (7th Cir. 1999) ................................21

*Chiarella v. United States*, 445 U.S. 222 (1980) ................................45

*Ciralsky v. CIA*, 355 F.3d 661 (D.C. Cir. 2004) ................................9

*\*Davis v. Giles*, 769 F.2d 813 (D.C. Cir. 1985) ................................21

*Fedorchick v. Massey-Ferguson, Inc.*, 577 F.2d 856 (3d Cir. 1978) ................................6

*\*Feld Entm't, Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*,
    873 F. Supp. 2d 288 (D.D.C. 2012) ................................36

*Fox v. Watco Cos.*,
    No. 09-2078, 2011 U.S. Dist. LEXIS 15734 (D. Kan. Feb. 16, 2011) ................................6

*\*Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000) ................................21

*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996) ................................32

---

[*] Authorities on which Plaintiff chiefly relies are marked by an asterisk.

## TABLE OF AUTHORITIES
### (continued)

Page

*Gerstein v. Pugh*, 420 U.S. 103 (1975)...................................................................................21

*\*Goldstein v. Kelleher*, 728 F.2d 32 (1st Cir. 1984)................................................................7

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159 (3d Cir. 2010).................9

*\*Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322 (8th Cir. 1985) .......................................13

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979) ..............................................................10

*\*Hartman v. Moore*, 547 U.S. 250 (2006)................................................................................24

*\*Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987)...........................................................8

*Hill v. City of Chicago*,
   No. 13-4847, 2014 U.S. Dist. LEXIS 66609 (N.D. Ill. May 14, 2014)....................................9

*\*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ...........................................................8

*Joy v. Bell Helicopter Textron*, 999 F.2d 549 (D.C. Cir. 1993)....................................................18

*\*Khorrami v. Mueller*, No. 07-812, 2014 U.S. Dist. LEXIS 870 (E.D. Wis. Jan. 6, 2014) ........2, 3

*King v. Macri*, 993 F.2d 294 (2d Cir. 1993) ............................................................................31

*Kirk v. Raymark Indus., Inc.*, 61 F.3d 147 (3d Cir. 1995) .........................................................7

*\*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)...........................................................8

*Lawson v. Trowbridge*, 153 F.3d 368 (7th Cir. 1998) ...............................................................5

*Lewis v. Elliott*, 628 F. Supp. 512 (D.D.C. 1986)................................................................32, 33

*\*Lopez v. Tyson Foods, Inc.*, 690 F.3d 869 (8th Cir. 2012) ......................................................17

*Machesney v. Larry Bruni, P.C.*, 905 F. Supp. 1122 (D.D.C. 1995)............................................1

*Mejia v. Cook Cnty.*, 650 F.3d 631 (7th Cir. 2011) ..................................................................33

*Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283 (9th Cir. 1999) ................................10

*Moore v. Hartman*, 388 F.3d 871 (D.C. Cir. 2004) (*"Moore III"*),
   *rev'd* 547 U.S. 250 (2006) ..............................................................................................26, 33

**TABLE OF AUTHORITIES**
(continued)

Page

*Moore v. Hartman*, 571 F.3d 62 (D.C. Cir. 2009) ("*Moore IV*").................................25

*Moore v. Hartman*, 644 F.3d 415 (D.C. Cir. 2011) ("*Moore V*") ................................24, 25, 26

*Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336 (7th Cir. 1985)..........................21

*Moore v. S. African Marine Corp.*, 469 F.2d 280 (5th Cir. 1972)...........................6, 25

*Mt. Healthy City Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ........................26

*Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160 (D.C. Cir. 2007).................1

*Nice v. ZHRI, Inc.*, 105 F. Supp. 2d 1028 (E.D. Ark. 2000)......................................31

*Owens v. Alabama Dep't of Mental Health & Mental Retardation*,
   2008 U.S. Dist. LEXIS 85906 (M.D. Al. Oct. 22, 2008)........................................29

*Pinkerton v. United States*, 328 U.S. 640 (1946)......................................................8

*Pitt v. District of Columbia*, 491 F.3d 494 (D.C. Cir. 2007) .........................................39

*Porter v. Cabral*, 2007 U.S. Dist. LEXIS 12306 (D. Mass. Feb. 21, 2007)...................31

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065 (2012)...........................6

*Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503 (9th Cir. 2004).............................30

*Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir. 1988).....................................................21

*Springer v. Seaman*, 821 F.2d 871 (1st Cir. 1987) .....................................................8

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ..........................................................9

*Swain v. Alabama*, 380 U.S. 202 (1965)...................................................................7

*Thompson v. Int'l Ass'n of Machinists & Aerospace Workers*,
   614 F. Supp. 1002 (D.D.C. 1985)..........................................................................32

*Tibbs v. Florida*, 457 U.S. 31 (1982)......................................................................33

*Uduko v. Cozzens*, 975 F. Supp. 2d 750 (E.D. Mich. 2013) ......................................9

*United Mine Works of Am. v. Pennington*, 381 US 657 (1965)...................................36

**TABLE OF AUTHORITIES**
(continued)

Page

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,*
  608 F.3d 871 (D.C. Cir. 2010) ................................................................5

*United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993) ...............................33

*United States v. Doe*, 903 F.2d 16 (D.C. Cir. 1990) ............................28, 29

*United States v. REI*, 725 F. Supp. 587 (D.D.C. 1989).............35, 40, 43, 45

*United States v. West*, 458 F.3d 1 (D.C. Cir. 2006) ....................................7

*United States v. Woodward*, 149 F.3d 46 (1st Cir. 1998) ...........................43

*United States v. Zarra*, 298 F. Supp. 1074 (M.D. Pa. 1969) .....................28

**STATUTES**

28 U.S.C. § 1870 ........................................................................................6

41 U.S.C. § 254(a) .....................................................................................43

**RULES**

Fed. R. Evid. 103 .....................................................................................28

*Fed. R. Evid. 105 ..............................................................................13–20

Fed. R. Evid. 801 .....................................................................................15

Fed. R. Evid. 803 .....................................................................................16

Fed. R. Civ. P. 15 .....................................................................................10

Fed. R. Civ. P. 59 .......................................................................................1

Fed. R. Civ. P. 61 .......................................................................................1

**OTHER AUTHORITIES**

*Charles Alan Wright *et al.*, Federal Practice and Procedure ...........10, 13, 18, 32, 33

*Cornelia Pillard, *Taking Fiction Seriously: The Strange Results of Public
  Officials' Individual Liability Under Bivens*, 88 Geo. L. J. 65, 77 (1999) ...............................2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Federal Property and Administrative Services Act of 1949, § 304(a)...........................................43

*Jack B. Weinstein, *Federal Evidence* § 105.07 .........................................................................13

Moore's Federal Practice § 59.13[2][b]......................................................................................1

Restatement (Second) of Torts §§ 875–80..................................................................................8

This *Bivens* action took far too long to get to trial.  Moore and his counsel genuinely appreciate the Court's efforts to finally put the matter before a jury, particularly after the prior judge was unexpectedly disqualified on the eve of trial.  After five trial judges, six Circuit arguments, and twenty-three years of civil litigation, all involved no doubt desire some finality.  But finality must yield to fundamental fairness.  The trial was tainted by several prejudicial errors, and the jury's verdict is against the great weight of the evidence.  A new trial is required.

## ARGUMENT

A new trial may be granted in a jury case "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Such reasons include errors in the giving or refusal of jury instructions; the improper admission or exclusion of evidence; and that the jury's verdict is against the clear weight of the evidence.  *See* Moore's Federal Practice § 59.13[2][b]; *Machesney v. Larry Bruni, P.C.*, 905 F. Supp. 1122, 1130 (D.D.C. 1995).  Legal errors require a new trial if they affected "a[] party's substantial rights," Fed. R. Civ. P. 61—*i.e.*, if they were prejudicial rather than harmless.  *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 168 (D.C. Cir. 2007).

The Court should order a new trial on Moore's *Bivens* claim for two reasons.  First, several legal errors, separately and in combination, resulted in an improperly selected jury, unfairly biased the jury against Moore, allowed improper prejudice into the record, prejudicially impacted the jury's assessment of whether the evidence supported Moore's claim, or otherwise undermined the overall fairness of the trial.  *See infra* Part I.  Second, the jury's verdict is against the clear weight of the properly admitted evidence, which overwhelmingly establishes that the defendants induced Moore's prosecution at least in part in retaliation for his exercise of First Amendment rights and without probable cause.  *See infra* Part II.

## I.     SEVERAL LEGAL ERRORS, SEPARATELY AND IN COMBINATION, AFFECTED MOORE'S SUBSTANTIAL RIGHTS

### A.     The Court Prejudicially Erred in Excluding Indemnification Evidence and Allowing Defendants To Mislead the Jury About Their Financial Exposure

Moore was severely prejudiced by the Court's pre-trial ruling excluding evidence and argument that Defendants would be indemnified for any judgment against them, and by the Court's mid-trial refusal to permit Moore to unconditionally introduce such indemnification evidence even after Defendants had improperly appealed to juror sympathy by repeatedly emphasizing that Moore was suing them "personally" for "a very large sum of money."

In a *Bivens* case where, as here, the defendants are represented by the United States, it is a "virtual certainty" that they will be indemnified for any adverse judgment.  Cornelia Pillard, *Taking Fiction Seriously: The Strange Results of Public Officials' Individual Liability Under Bivens*, 88 Geo. L. J. 65, 77 (1999); *see also* Pl.'s Mot. re Source of Payment (Dkt. 422) at 2–4.[1] Informing the jury in such a case only of the legally accurate formalism that the defendants are being sued personally, without further disclosing the facts about indemnification, elevates form over substance, and misleads the jury into believing wrongly that the defendants' personal assets are at stake.  That misimpression wrongly tips the scales in the defendants' favor.

Where a jury is thereby given the mistaken "impression that the defendant will be personally responsible for paying damages," the door is "opened … to the plaintiff's presentation of evidence showing that the defendant will be indemnified."  *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1030 (N.D. Ill. 2011); *see also Khorrami v. Mueller*, No. 07-812, 2014 U.S. Dist. LEXIS 870, at *15–16 (E.D. Wis. Jan. 6, 2014) ("explain[ing] to the jury that this is a *Bivens* suit

---

[1] Early in the history of the case, Defendants were each offered the opportunity to discuss dismissal in return for cooperation.  That they chose to remain united and share the same counsel made no sense unless they believed they would be indemnified and had no real financial risk.

formally seeking relief against [a defendant] in his personal capacity" "is enough to open the door to indemnification evidence").  Since the jurors would inevitably infer from the very nature of the case that Defendants would personally bear the financial burden of any judgment, it was error to deny Moore's pre-trial motion to admit indemnification evidence subject to Defendants somehow *further* "open[ing] the door to that."  6/17/14 Hr'g Tr. at 177–78.

This error was compounded when the Court refused to let Moore unconditionally introduce indemnification evidence after Defendants repeatedly engaged in theatrics designed to mislead the jury into thinking that their "personal assets [we]re somehow in danger."  *Khorrami*, 2014 U.S. Dist. LEXIS 870, at *15.  Defense counsel emphasized three times during his opening statement that Moore was "suing" the defendants "personally" in a manner where the context, emphatic repetition and intonation of the assertions plainly—and falsely—conveyed to the jury that personal monetary liability was at stake.  6/24/14 AM Tr. at 66:1–2, 86:13–14, 86:17–19.  Lest the message be lost, defense counsel had the inspectors stand and introduce themselves to Moore's damages expert Dan Cruse, before asking Cruse and Moore's other damages expert Philip Fanara whether they knew that Moore was suing the inspectors "personally" for "a very large sum of money."  6/26/14 PM Tr. at 17–18; 6/27/14 AM Tr. at 43.  The jurors were thus given a disingenuous message that they should spare these retired government employees from the potentially ruinous monetary liability that Moore sought to impose.  Such a blatant appeal to juror sympathy would have been improper even if Defendants were financially responsible for any damages; that the very premise of this tactic was false greatly magnified its impropriety.

But when Moore subsequently moved for the curative admission of indemnification evidence on the ground that these statements and theatrics had opened the door to such evidence under the Court's prior ruling, the Court's reaction was openly and improperly hostile.  *See*

7/9/14 AM Tr. at 43:25 to 55:22.  The Court expressed skepticism that the door had been opened, noted that Moore's counsel had himself asked Inspector Hartman to confirm that he was being sued individually, and—most erroneously—declared that if indemnification evidence were admitted, Defendants would have the right to offer evidence about the details of their finances, such as "how many of them own a one-acre property with a tennis court and a swimming pool." *Id.* at 50:9–11.  Then, rather than granting or denying the motion outright, the Court offered Moore the Hobson's choice of having the motion denied or having it granted along with leave to Defendants to "fling the door open" to evidence of "all of the assets, credit cards, bills, mortgage payments, the amount earned over the course of their employment history."  *Id.* at 53:21 to 54:5. But that would only have exacerbated the prejudice by causing the jury to believe that such facts were probative and perpetuating the false impression that Defendants were personally at financial risk.  Faced with this offer of conditional admission that would have created "a war of who's got more asserts or less assets or who deserves more," *id.* at 52:7–9, Moore was forced to withdraw the motion rather than suffer additional prejudice.  *Id.* at 55:14–17.

It was further error not to allow evidence of indemnification after the door had been so clearly opened.  The idea that Defendants were financially on the hook had been transformed from an inference to be drawn from the fact that this was an individual-capacity lawsuit to a series of express, unrebutted assertions by defense counsel that the inspectors would "personally" have to pay "a very large sum of money" were the jury to rule against them.  Nor would the admission of indemnification evidence have required an inquiry into all sorts of individual financial detail, as the Court suggested.  Such detail would have been irrelevant given the virtual certainty of indemnification.  And, even if the Court somehow deemed indemnification as less than certain (a theoretical possibility that has never actually happened

according to Judge Pillard's article), a digression into Defendants' "assets, credit cards, bills, mortgage payments, [and] the amount earned over the course of their employment history" would only serve to allow Defendants the opportunity to further mislead the jurors, to further appeal improperly to their sympathies, and—given Moore's own financial circumstances—to improperly make the right to a *Bivens* remedy dependent on the relative net worth of the parties.

These errors were extremely prejudicial and require a new trial.  An evidentiary error is harmless only if "(1) the case is not close, (2) the issue not central, or (3) effective steps were taken to mitigate the effects of the error." *Ashcraft & Gerel v. Coady*, 244 F.3d 948, 953 (D.C. Cir. 2001).  Here, the case *was* close, *see infra* Part II, and the Court, believing indemnification evidence unwarranted, took no steps to mitigate the prejudicial effects of the efforts to misinform the jury and engender sympathy for Defendants.  The issue was also central, since Defendants' purported personal responsibility to pay any damages necessarily affected the jury's assessment of every question it was deciding.  Such "arguments to the jury about a defendant's wealth are grounds for new trial." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 897 (D.C. Cir. 2010) (per curiam); *see also Lawson v. Trowbridge*, 153 F.3d 368, 379–80 (7th Cir. 1998) (new trial where indemnification evidence was erroneously excluded).  Indeed, the way defense counsel raised the issue—several times during opening, and then even more dramatically with each of two damages experts—demonstrates that this was no stray, harmless remark.  *See Caudle v. Dist. of Columbia*, 707 F.3d 354, 363 (D.C. Cir. 2013) (new trial, despite curative instruction, where "counsel made four impermissible statements—each escalating from the last").  It was, rather, a calculated effort to encourage the jurors to reach a decision not on the evidence presented, but based on sympathy for the perceived less-wealthy retired government employees, who in reality had no financial exposure because of the certainty of indemnification.

**B.      The Court Abused Its Discretion in Allowing Defendants Six Peremptory Challenges to Moore's Three**

The Court's failure to recognize the fictitious nature of Defendants' "personal liability" appears to account, at least in part, for a second error.  In light of their unity of interest— including but not limited to their lack of personal financial exposure—the Court should not have granted Defendants six peremptory strikes to Moore's three.  *See* 6/17/14 Tr. at 32:2–4 (denying Moore's motion to limit Defendants to three peremptory challenges).  This error requires a new trial without any further case-specific showing of prejudice, which exists here in any event.

The statute governing peremptory challenges in civil cases provides (in its first sentence) that "each party shall be entitled to three peremptory challenges," and (in its second sentence) that "[s]everal defendants or several plaintiffs may be considered as a single party for the purposes of making challenges or … may [be] allow[ed] additional peremptory challenges." 28 U.S.C. § 1870.  Because "the specific governs the general" where "a general authorization and a more limited, specific authorization exist side-by-side," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012), the second sentence unambiguously governs the number of challenges to be awarded in a multi-defendant case such as this one.

In applying the second sentence, a court must decide whether or not to treat a group of parties on the same side of a matter as a single party based on "the extent … to which their interests are not aligned."  *Fox v. Watco Cos.*, No. 09-2078, 2011 U.S. Dist. LEXIS 15734, at *3–4 (D. Kan. Feb. 16, 2011); *see also Moore v. S. African Marine Corp.*, 469 F.2d 280, 281 (5th Cir. 1972) (court may require multiple defendants "to share the same number of peremptory challenges allowed to the plaintiff"); *Fedorchick v. Massey-Ferguson, Inc.*, 577 F.2d 856, 858 (3d Cir. 1978) (en banc) (same).  The rationale is that non-aligned interests may cause disagreements over the need to strike a juror.  But if multiple defendants are represented by same

the attorney and have identical interests, it is an abuse of discretion for a court to grant any additional peremptory challenges.  *See Goldstein v. Kelleher*, 728 F.2d 32, 37 (1st Cir. 1984).

Because of their unity of interests, the multiple defendants here should have been treated "as a single party" and allocated collectively the same number of peremptory challenges (three) as Moore.  The individual defendants were represented by shared Justice Department counsel throughout the duration of the litigation, so there was no need for additional peremptory strikes to accommodate differences in trial strategies.  Treating the defendants' interests as anything less than identical was especially unwarranted given the "virtual certainty" that they would be indemnified for the full amount of any judgment against them.  *See supra* p. 2.

An erroneous allocation of peremptory challenges is inherently prejudicial and automatically requires a new trial without a case-specific showing of prejudice.  *See Swain v. Alabama*, 380 U.S. 202, 219 (1965) ("[t]he denial or impairment of the right [to peremptory challenges] is reversible error without a showing of prejudice"); *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 162 (3d Cir. 1995) (same).  *But see United States v. West*, 458 F.3d 1, 9 (D.C. Cir. 2006) (suggesting but not deciding that the automatic-reversal rule announced in *Swain* may not be absolute).  Even under traditional harmless-error review, the error here requires reversal. Allowing Defendants to exercise three extra peremptory strikes in selecting a jury of ten clearly gave them a significant unfair advantage in shaping the composition of the jury to eliminate jurors perceived to be more likely to favor the plaintiff and limiting the extent to which the jury represented a balanced cross-section of the community.

### C.     The Court Erred By Not Giving an Instruction on Concerted Action

The court also prejudicially erred in rejecting Moore's proposal to instruct the jury how the actions of those working together or acting in concert in the circumstances presented here are to be imputed to others in the group.  *See* Joint Pretrial Stmt, Annex M, Proposed Instr. No. 9;

7/17/14 PM Tr. at 7:20 to 8:10, 19:4 to 23:11.  This error—and the derivative decision to use a verdict form directing the jury to assess liability for a particular defendant based solely on his own acts (and not on the acts of his co-conspirators or on acts of the group that could not be ascribed to an identified member)—prevented the jury from assessing the full range of conduct attributable to each defendant and, critically, insulated AUSA Valder's conduct from any assessment at all, much less proper attribution to those who acted in concert with him.  The jury was effectively instructed to limit its deliberation to evidence tied to each defendant, one by one.

Joint venture and concert of action are well-settled theories in tort law, including constitutional tort law, on which Moore was entitled to rely to prove the personal liability of each defendant.  *See* Restatement (Second) of Torts §§ 875–80.  An officer is liable under *Bivens* if he had "personal involvement" in the deprivation of constitutional rights.  *Haynesworth v. Miller*, 820 F.2d 1245, 1259 (D.C. Cir. 1987).  To be personally involved, officers must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."  *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).  Participation in concerted action—a conspiracy—is such involvement, because "[t]here is no such thing as accidental or inadvertent participation in a conspiracy."  *Id.* at 993; *see also, e.g.*, *Springer v. Seaman*, 821 F.2d 871, 879 (1st Cir. 1987) (where "inference can reasonably be drawn that [officers] were acting in concert," there is disputed "question of fact … as to personal involvement").  The consequence of a conspiracy is that all foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all other co-conspirators.  *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) ("the fact of the conspiracy makes a party liable for the unconstitutional actions of the party with

whom he has conspired").[2]

At one point before trial the Court questioned whether Moore had pleaded conspiratorial liability.  Paragraphs 4 and 4(a) of the complaint show clearly that this was pleaded, especially in view of the liberal notice-pleading standards of the Federal Rules, *see, e.g., Ciralsky v. CIA*, 355 F.3d 661, 668–70 (D.C. Cir. 2004).  *See* Compl. ¶ 4 ("Defendants … did conspire to interfere with and violate, and did interfere with and violate, plaintiffs' rights and privileges."); *id.* ¶ 4(a) ("Defendant Valder, acting individually and/or in concert with the other defendants, also was responsible for the pre-trial activities and trial of the case against Plaintiff").  The complaint also specifically alleged numerous concerted acts of misconduct from which a conspiratorial agreement could be inferred.  *See* Compl. ¶¶ 4(b), 14, 17, 18, 19, 20, 21, 22, 24, 31 (all alleging collective action by the individual defendants).  Defendants were thus from the start on notice that Moore was pursuing liability on this basis, and, indeed, for more than two decades and through six trips to the D.C. Circuit, the case proceeded with both sides treating the evidence as if it applied to all of the inspectors acting collectively.[3]

---

[2] To the extent this Court may have concluded that conspiratorial liability is inconsistent with *Ashcroft v. Iqbal*, *see* 7/17/14 PM Tr. at 23:1–9, that would be incorrect.  *Iqbal* rejected *vicarious liability*—*i.e.*, the claim that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution"—on the ground that a government official "is only liable for his or her own misconduct."  556 U.S. 662, 677 (2009).  "[P]urpose, rather than knowledge," the Supreme Court explained, "is required to impose *Bivens* liability."  *Id.*  But as the cases discussed above correctly explain, unlike vicarious liability, conspiratorial liability *is* a form of personal liability that arises from a purposeful decision to conspire with others.  That is why other courts have concluded, either expressly or implicitly, that the principle of conspiratorial liability for constitutional torts "remains good law following … *Iqbal*."  *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010); *see also Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011); *Brennan v. William Paterson College*, No. 11-6101, 2014 U.S. Dist. LEXIS 99781, at *35 (D.N.J. July 23, 2014); *Hill v. City of Chicago*, No. 13-4847, 2014 U.S. Dist. LEXIS 66609, at *28–29 (N.D. Ill. May 14, 2014); *Uduko v. Cozzens*, 975 F. Supp. 2d 750, 756 (E.D. Mich. 2013).

[3] If the Court nevertheless believed that the pleading was inadequate, it should have so stated and then given Moore the opportunity to amend the complaint to conform to the evidence

The evidence introduced at trial clearly supported the giving of the instruction; it showed that the defendants worked collaboratively with one another on an assigned task force and with Valder under circumstances supporting an inference of conspiratorial intent.[4] Defendants Hartman, Kormann, Edwards, and McIntosh worked together as part of a special task force referred to as the "Black Hole." *See* Kormann Designations (Dkt. 489-1) at 122:3–15; Clauson Designations (Dkt. 494-1) at 206:7–18. They drafted the investigative strategies memo as a "group," laying out and pursuing a concerted plan to target Moore's constitutionally protected speech "at [a] time" when "[t]here was no conspiracy" and "[t]here was no evidence that there was a scheme to defraud." Edwards Designations (Dkt. 497-1) at 441:13–20, 442:16 to 444:2, 446:2 to 447:2, 447:7–12; *see also* PE 107 at SMFC4 00216. They also worked as "a team" with Valder, 7/2/14 AM Tr. at 82:17–18; *see also* Valder Designations (Dkt. 488-1) at 149:17 to 151:99 (Valder and the inspectors worked "in tandem" and "consulted with each other every step of the way" "like a hand in glove"); 7/17/14 AM Tr. at 95:14 to 97:20 (Valder relied on inspectors to do his own job); 7/10/14 PM Tr. at 87:8–12 (Hartman: "[i]t was a joint investigation"), including when Valder undertook conduct that the jury could have found wrongful. For example, all four members of the task force participated in and helped plan the

---

(continued…)

uncovered during discovery and at trial. *See* Fed. R. Civ. P. 15(b); 6A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1491 (3d ed. & West Supp. 2014) [hereinafter Wright & Miller] (Rule 15(b) promotes deciding cases on the merits, rather than on "pleading skills" or "on the basis of a statement of the claim … made at a preliminary point in the action").

[4] "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999); *see also Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979) ("question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can 'infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding' to achieve the conspiracy's objectives" (quoting *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59 (1970))).

intimidation session designed to influence Spartin's testimony where Valder tore up a copy of Spartin's immunity agreement.  *See* 7/7/14 AM Tr. at 39:16–21, 42:12 to 43:6; 7/1/14 AM Tr. at 37:6–20, 38:4–9; McIntosh Designations (Dkt. 491-1) at 194:10–12, 197:13–20; Edwards Designations (Dkt. 497-1) at 121:17 to 127:2, 150:10 to 151:8.  And Hartman and Kormann participated in Valder's improper disclosure of grand-jury statements to Spartin to shape his testimony, *see* 7/1/14 AM Tr. at 64:14 to 67:22; 7/7/14 AM Tr. at 104:1 to 105:25, worked with Valder to script the grand-jury statements, *e.g.*, 7/1/14 AM Tr. at 54:11–16, 58:10–22, including "collectively" deciding to not reveal points Bray wished to include, *id.* at 86:3 to 88:10, and were "silent partners" with Valder when he discussed "winning the case [against Moore] regardless of the merits of the case itself," Hittinger Designations (Dkt. 488-2) at 27:15–25.

The failure to give a concerted-action instruction, coupled with the nature of the requirement that the jury consider the evidence separately as to each defendant based solely on that defendant's own acts (and not the acts of his co-conspirators), was severely prejudicial to Moore.  For one, it improperly prevented the jury from attributing to any individual inspector the conduct of his co-defendant inspectors.  For example, in determining whether Edwards and McIntosh were liable, the jury was prevented from considering the conduct of Hartman and Kormann described above.  Conversely, in determining whether Hartman and Kormann were liable, the jury could not consider (for instance) McIntosh's "completely improper" and "inappropriate" disclosure of investigatory materials to Paul Carlin to help him sue Moore and REI, *see* McIntosh Designations (Dkt. 491-1) at 389:21 to 393:17; Clauson Designations (Dkt. 494-1) at 168:5–12; 7/8/14 AM Tr. at 85:8–23, or Edwards's "unpleasant," "threatening," "forceful" and "heavy-handed" treatment of Frank Bray, *see* 6/30/14 AM Tr. at 89:23 to 91:24; Edwards Designations (Dkt. 497-1) at 305:17 to 316:19.  Relatedly, given the way the verdict

form was constructed and absent the requested instruction on concert of action and imputation, where the evidence showed that *an* inspector was responsible for a statement or action, but did not necessarily establish *which* specific inspector was responsible, the evidence essentially did not count against any of the inspectors. *See, e.g.*, PE 269 at 10; Valder Designations (Dkt. 488-1) at 95:1–9, 17–21, 273:10 to 276:1; 7/10/14 PM Tr. at 87:4–5; 7/14/14 AM Tr. at 99:24–25; Edwards Designations (Dkt. 497-1) at 254:14 to 255:22; 7/15/14 PM Tr. at 124:1–14; PE 190 at SMFC4 07638; PE 195 at POS-004-0604.

Perhaps more significantly, if the jury believed that the inspectors and Valder had conspired to deprive Moore of his rights, the absence of a concerted-action instruction prevented the jury from attributing to the inspectors any of the conduct of Valder—who himself had been held absolutely immune from suit even if he acted improperly or with bad motive—unless the jury first found that the inspector personally participated in that conduct. So if an inspector was not present when Valder acted—as Edwards and McIntosh were not when Valder tampered with Bray's witness statement and gave Spartin the witness statements of his co-conspirators—then Valder's acts were not part of the mix of evidence that the jury could consider in determining that inspector's liability even though they conspired to harm Moore and admittedly worked as a team. And if an inspector was present when Valder acted (as Hartman and Kormann often were), Moore needed to carry the higher burden of establishing the inspector's personal involvement in the face of trial testimony by the inspectors seeking to minimize their own roles in what the jury could have deemed to be misconduct or inducement by Valder. *See, e.g.*, 7/11/14 AM Tr. at 11:1–7 (Hartman seeking to minimize inspectors' role in tearing up of Spartin's immunity agreement); *id.* 11:14 to 12:1 (same regarding disclosure of statements to Spartin); *id.* at 108:13–17 (same regarding decision to draft indictment); 7/14/14 AM Tr. at

119:4–16 (same regarding presentation of case to Valder's supervisors).

The cumulative effect was that the jury could not properly consider the totality of the evidence of each individual inspector's conduct and motives or see the full picture as to any one of the inspectors. The Court simply denied Moore the benefit of what the law allows in multi-actor, common-purpose cases. And since the jury was thus severely limited in its ability to evaluate all of the evidence against each of the inspectors, its findings that no inspector had a retaliatory motive or induced Moore's prosecution were necessarily tainted and cannot stand.

### D.   The Court Erred in Admitting and Then Failing To Limit the Use of Hearsay Evidence Relevant to Retaliatory Intent and Probable Cause

The Court also prejudicially erred in admitting improper hearsay, and then compounded that error when it denied Moore's request for a limiting instruction. Under the rules of evidence, "[i]f the court admits evidence that is admissible … for a purpose—but not … for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105. Rule 105 leaves no discretion; "the court commits error when it refuses a properly requested instruction." 21A Wright & Miller, *supra*, § 5066; *see also* Jack B. Weinstein, *Federal Evidence* § 105.07 ("Since this language is mandatory, the court may not refuse a request for a limiting instruction even though the jury is unlikely to be improperly influenced by the evidence."); *Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1334–35 (8th Cir. 1985) (new trial where district court refused to give limiting instructions).

During the three-year investigation that led to Moore's indictment, Defendants gathered information from dozens of witnesses, produced dozens of interview memoranda and field notes, and drafted several summaries of the evidence. Nearly all of these documents and related testimony had some arguable relevance to one or more of the issues presented to the jury, including whether Defendants harbored retaliatory motives against Moore, whether they induced

Moore's prosecution, and whether the evidence accumulated gave rise to probable cause.  Nearly all of this evidence, however, was also objectionable on hearsay grounds.  To take but one example, Defendants' Exhibit 154 is the statement of Michael Marcus, authored by Inspectors McIntosh and Hartman, that was read during Marcus's testimony to the grand jury.  The Court indicated that the document was relevant to showing the process the inspectors followed in presenting evidence to the grand jury, but—in addition to itself being hearsay (as an out-of-court assertion by Hartman and McIntosh about what Marcus told them)—the document also includes several additional layers of hearsay, such as:  "Gnau had told Marcus that Voss stated that" a postal contract could be awarded within certain timeframe.  DX 154 at DOJ4 001261.[5]

Moore prior to trial objected to such evidence as including multiple levels of inadmissible hearsay, *see* Joint Pretrial Stmt, Annex D note 1, and, renewed this objection throughout the presentation of Defendants' case.  The Court's rulings were inexplicably inconsistent.  On occasion, the Court sustained Moore's hearsay objections, for instance, preventing Defendants' witness Charles Clauson from testifying about statements that DPMG Strange made during a July 1985 interview, *see* 7/10/14 AM Tr. at 111:5–19, and preventing Hartman from describing what two witnesses told him during a separate interview, *see* 7/10/14 PM Tr. at 42:1 to 43:19.

But other evidence constituting extremely prejudicial hearsay was nevertheless widely admitted.  Although Clauson could not himself describe his conversation with Strange, the Court admitted Clauson's memorandum summarizing that same interview, including Strange's

---

[5] *See also, e.g.*, 7/11/14 AM Tr. at 8:10–14 (Hartman reading from DX 65:  "'Mr. Voss stated that Mr. Spartin told him that he'—Spartin—'would contact … Moore, to discuss the circumstances surrounding the Casey recommendation.'"); DX 63 at DOJ28 000788 ("PV said Marcus said that there would be some type of bonus for Gnau if REI … got a USPS contract."); DX 19 at SMFC4 10244-45 ("[Jackie Strange] indicated that she had told Ruth Peters … on at least one occasion that Ruth was hinging on breaking the law whereupon Ms. Peters expressed the sentiment that 'Peter will get me into trouble.'").

statements.  *See id*. at 111:12 to 113:18 (admitting DX 19 over objection).  While Hartman could

not testify what one set of witnesses told him, the Court admitted documents that Hartman

sponsored detailing what another set of witnesses told him.  *See* 7/10/14 PM Tr. at 46:22 to 48:3

(admitting DX 51 over objection).  Moore was permitted to lodge a standing objection to such

evidence, to which his counsel referred back throughout Defendants' case.  *See* 7/10/14 PM Tr.

at 49:15–17 (receiving "a continuing objection to the questions eliciting hearsay"); 7/11/14 AM

Tr. at 27:25 to 28:9 ("I just wanted to renew my objection."); 7/14/14 PM Tr. at 40:1–2 ("[W]e

object as we have with these other similar such documents under the hearsay rule."); 7/15/14 PM

Tr. at 81:8–19 ("I continue the other hearsay objection…. I'm continuing my prior hearsay.").[6]

The Court erred not only by overruling Moore's objections, but also by failing to

properly guide the jury's consideration of the evidence, which ultimately came into the record as

non-hearsay.  *See* Fed. R. Evid. 801(c)(2).  The constant refrain from Defendants in support of

this evidence—and the grounds on which the evidence was admitted—was that the information

was "not being offered for its truth but to demonstrate the effect upon [investigators], [their] state

of mind, and also the development of probable cause."  7/10/14 AM Tr. at 112:12–15; *see also*

*id*. at 102:13–14; 7/10/14 PM Tr. at 42:10–18; *id*. at 47:22 to 48:2; *id*. at 75:22 to 76:5; *id*. at

98:10–11; 7/11/14 AM Tr. at 29:12–15; *id*. at 53:11 to 54:3; *id*. at 60:4–8; 7/14/14 PM Tr. at

40:1–3; 7/15/14 PM Tr. at 81:3 to 82:13.  As the Court stated, "[w]hether what is in [the

document] is true or not true is beside the point."  7/10/14 PM Tr. at 76:4–5; *see also* 7/15/14

PM Tr. at 81:23–25 (the Court stating that the document "is not being offered for the truth but it

---

[6] There were occasions when Moore did not object to exhibits containing hearsay but those were either inconsequential or subject to the continuing objection.

is being offered to help support what the reasons were for the probable cause").[7]

Moore therefore invoked Rule 105. On the morning of the second day of Defendants' case, Moore's counsel asked the Court to "at some point instruct the jury that these are not going in for the truth of the matter that are contained in them either now or in the jury instruction." 7/11/14 AM Tr. at 54:6–9. The Court initially endorsed the idea, *id*. at 54:19–20, and instructed Moore to "draft a proposed instruction [and] confer with opposing counsel," *id*. at 54:14–15. That same day, Moore circulated a proposed instruction to Defendants. Only after four days did Defendants—who had indicated that they were working on an alternative draft—finally respond that they could neither agree to Moore's proposal nor suggest a counter-proposal. Accordingly, Moore presented his proposed instruction to the Court on the morning of July 16. *See* 7/16/14 AM Tr. at 5:19 to 6:18.[8]

That the circumstances warranted an instruction was not just a matter of what Rule 105 requires. Moore's repeated objections had not escaped notice by the jurors, who submitted a note to the Court specifically asking for an explanation of what hearsay meant. *See* Juror Note (Dkt. 498); 7/10/14 PM Tr. at 122:21 to 123:15. The Court's response, however, informed the jury only that hearsay "is a basis, a one word basis for an exception for an objection with lots of different exceptions and considerations." *Id*. at 7/10/14 PM Tr. at 79:10 to 80:11. The Court provided no instruction regarding how the jury should regard hearsay evidence or the limited

---

[7] The Court twice cited Rule 803(3) as additional support for admitting the evidence. Both times, however, Defendants or the Court indicated that the evidence was *not* being offered for the truth. 7/10/14 PM Tr. at 76:2–12; 7/11/14 AM Tr. at 29:12–22. As an exception to the hearsay rule, Rule 803 was thus inapplicable. And Rule 803(3) would not have established the admissibility of any second or third layer of hearsay within the documents, as required by Rule 805. No other applicable exceptions were identified.

[8] During the time Defendants were supposedly considering Moore's proposed instruction, they successfully moved into evidence at least eight exhibits that the instruction would have encompassed. *See* DX 2, DX 63, DX 73, DX 77, DX 81, DX 96, DX 210, & PE 153.

purpose for which any particular evidence had been admitted.

The Court rejected Moore's proposal and declined to give any limiting instruction, stating that the proposal would be "confusing to the jury" "as to which particular exhibits this instruction might apply," particularly since "there were a number of exhibits that are outlined in this proposed instruction … that the plaintiff introduced with absolutely no objection that a limiting instruction would apply."  7/16/14 PM Tr. at 119:3–10.  In the end, the jury was allowed to consider for any purpose evidence that had been let in only for some limited purpose.  The jury was exposed to extremely prejudicial hearsay without any limitation.

There was nothing improper about the scope of Moore's proposed instruction; it was precisely because of the plethora of relevant evidence and the disparate reasons for its admission that some generality was necessary.  Moreover, a limiting instruction need not have encompassed only that evidence to which Moore had objected.  Rule 105 is only implicated, after all, where a document *is* admissible; a limiting instruction is thus appropriate even where there was no objection at the time the evidence was admitted.  *See Lopez v. Tyson Foods, Inc.*, 690 F.3d 869, 881–82 (8th Cir. 2012).  Similarly, nothing in Rule 105 precludes a party from seeking an instruction regarding the limited purpose of that party's own evidence; to the contrary, Rule 105 also applies to "evidence that is admissible against a party … but not against another party," and Moore had the right to introduce Defendants' out-of-court statements *against them* pursuant to Rule 801(d)(2).  Moore's proposed limiting instruction therefore would have advised jurors that *all* evidence—including testimony—regarding "various summary statements, interview memoranda, summary charts, handwritten notes and other similar documents that were authored by the postal inspector defendants and/or [AUSA] Valder" had been introduced for a limited purpose and could not be considered "as evidence of the truth of the facts asserted by the

persons interviewed." *See* Proposed Instruction (attached hereto as Exhibit A).

The Court apparently thought that the requested instruction was vague or overbroad, but disagreement with the precise language of Moore's proposal was not proper grounds to deny a mandatory instruction under Rule 105. *See* 21A Wright & Miller, *supra*, § 5066 ("The court need not give the limiting instruction in the form proposed by the party."); *Joy v. Bell Helicopter Textron*, 999 F.2d 549, 556 (D.C. Cir. 1993) (district courts have discretion when choosing the particular language of an instruction). Individual exhibits could have been identified by number or other specificity incorporated in time for the instruction to be given prior to the close of the evidence or with the final charge. If a perceived lack of precision was the defect in Moore's proposal, the cure was to revise the instruction, not scrap it altogether.[9]

The impact of this evidence and the lack of a limiting instruction was substantial and prejudicial. Multiple pieces of extremely prejudicial hearsay evidence were placed before the jury—ostensibly not for the truth of the matters asserted, but, in the end, the jury was not told that. Without a limiting instruction, the jury was free to consider that evidence as substantive proof of the facts asserted. This shouldered Moore with the added burden of disproving the truth of evidence that was never proffered for its truth—a particularly difficult burden in this case given the volume of evidence at issue, the substantial passage of time and loss of recall, and the unavailability of key witnesses. If Defendants wanted such evidence from Marcus, Spartin, or Gnau, they should have called them as witnesses or deposed them when they had the chance.

---

[9] For instance, a more precise instruction could have specifically identified, at the very least: DX 1 (Details of Offense); DX 2 (statements of Moore and Reedy); DX 19 and DX 73 (memoranda from interviews with Strange and Gnau); DX 55 (Feb. 1986 Preliminary Report); DX 56 and DX 175 (handwritten notes of Spartin interviews); DX 63 (handwritten notes of Voss interview); DX 65, DX 151, and DX 154 (grand-jury statements of Voss, Gnau, and Spartin); DX 77 and DX 210 (handwritten notes of Gnau interviews), DX 81 (handwritten notes of USAO meeting); DX 228 and DX 235 (handwritten charts); and testimony about these exhibits.

For example, over objection, the Court admitted DX 154, Marcus's statement to the grand jury, which was itself suspect as having been drafted by Defendants.  Doing so permitted Hartman to read to the jury his own out-of-court assertion that Marcus had made an out-of-court statement about a prior out-of-court statement that Spartin had purportedly made to Marcus, according to which, by March 1986, "'Reedy, Moore, Gnau and Voss [had] already met and developed a story to cover up their involvement'" and "'had purged their files.'"  7/11/14 AM Tr. at 37:6–9.  This "purging" allegation became central to Defendants' case and, they testified, the purported reason behind missing pages in Moore's notebooks.  *See id*. at 95:11–19; *id*. at 98:22 to 99:10; 7/15/14 AM Tr. at 53:10 to 54:10.  This was so notwithstanding that no other conspirator mentioned any "purging" strategy, *see* 7/11/14 AM Tr. at 39:9–12, and that each of the conspirators, including Spartin himself, had contradicted Marcus's claim with statements— repeated before the grand jury in the inspector-drafted witness statements—that made no reference to purging files and that did not implicate Moore in any effort at a cover-up.  *See* PE 137 at VM 007903; PE 206 at SMFC 401707–09; DX 65 at DOJ28 000598–600.  Similarly, the Court admitted over objection evidence of what members of REI's board of directors purportedly told inspectors about the directors' knowledge of events, necessitating additional evidence from Moore to rebut the inspectors' testimony.  *Compare* 7/11/14 AM Tr. at 52:11 to 54:3, *id*. at 59:24 to 60:23, *and* 7/15/14 AM Tr. at 101:19 to 103:25, *with* 6/24/14 PM Tr. at 23:1–8; PE 235 at SMFC3 02725; PE 541 at 15:15 to 16:4, 24:25 to 25:7; *and* PE 542 at 41:18 to 43:5.[10]

In many cases, Moore could—and did—present evidence to rebut allegations that he

---

[10] Notably, some of Defendants' testimony regarding the REI directors can only be characterized as false.  Kormann told the jury that REI director Israel Sheinberg informed investigators that he "did not know about the Peter Voss recommendation of Gnau & Associates to Robert Reedy."  7/15/14 AM Tr. at 103:7–16.  But handwritten notes from a February 1987 interview with Sheinberg—which Kormann personally attended—specifically state that "RWR [Reedy] told IS [Sheinberg] that Voss recommended GAI."  PE 235 at SMFC3 02725.

purged files or concealed information from REI's board.  But whether Moore could balance the scales or even tip them in his favor on these discrete issues is beside the point.  In the first place, there should never have been any hearsay evidence on these issues that the jury was allowed to consider on its face.  If such evidence was going to be admitted for any purpose, only the properly requested limiting instruction under Rule 105 could provide that assurance, keep the jury's deliberations properly focused, and avoid imposing undue burdens of proof on Moore.

The error in admitting this evidence or, alternatively, in not giving a limiting instruction affected every one of the disputed elements of Moore's claim.  Most obviously, the jury's consideration of the hearsay evidence for its truth would have impacted the jury's assessment whether Moore was involved in the Voss-Gnau scheme, which in turn surely tainted the jury's assessment of whether there was probable cause for the prosecution, whether Defendants acted because of retaliatory motive, and whether prosecutors would have filed the charges anyway.

In the end, the jury received and without limitation was allowed to consider prejudicial hearsay assertions without Moore being able to cross-examine those to whom such statements were attributed.  After repeated objections were overruled, Moore asked for a proper limiting instruction.  Under Rule 105, Moore was entitled to that instruction, and the decision not to provide one warrants a new trial.

### E.     The Probable Cause Instruction Was Inadequate in Critical Respects

The Court also erred in failing to instruct the jury with the following language, requested by Moore, as part of the definition of probable cause:

> The question is whether a reasonable person who knew of all the available evidence, including exculpatory evidence, after a full and fair investigation, would have concluded that the charged crime was committed by the charged defendant…. This is what a reasonable person would believe, not what … these defendants or the prosecutor personally believed.

7/17 AM Tr. at 188:15–23; *see also* 7/17 PM Tr. at 12:10 to 14:13; 7/18 Tr. at 228:10 to 230:14.

This language captures three critical elements of probable cause.  First, an officer "must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause."  *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).  Second, "it is proper for the jury to consider … the sufficiency of the … investigation … in determining whether there was enough evidence to establish probable cause."  *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1347 (7th Cir. 1985)); *see also Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988) (no probable cause where officer "did not avail himself of readily available information that would have clarified matters to the point that one of the offenses would have been flatly ruled out as factually unsupportable").  Third, "the official's subjective belief as to the legal basis of the prosecution is irrelevant; the test for probable cause is an objective one."  *Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *Davis v. Giles*, 769 F.2d 813, 815 (D.C. Cir. 1985).

The probable cause instruction given by the Court either omitted or failed to adequately explain each of these three elements.  The result was seriously prejudicial to Moore.  First, though the final instructions did refer to the need to consider the "totality of the evidence" (7/18/14 Tr. at 229:22), the failure to expressly instruct on the need to consider the exculpatory evidence (coupled with testimony offered by defense witnesses) would likely have misled the jury into thinking that its probable cause determination could be based solely on the evidence of guilt, undiscounted for the countervailing evidence of innocence, or that the determination was limited to what was actually put before the grand jury.  *See* 7/10/14 AM Tr. at 52:17–19 (Jarrett: "I don't believe there's an existing obligation to produce every shred of exculpatory evidence to a grand jury.").  It was especially important for the jury to understand the correct rule of law in this case because the Government's many pieces of alleged circumstantial evidence could be seen as

cumulatively supporting an inference of guilt when divorced from the exculpatory evidence.  But the jury was not properly told to assess the overwhelming evidence exonerating Moore that was withheld from the grand jury.  *See infra* Part III.C (detailing evidence relating to probable cause).

Second, the omission of the requested language about the need for a "full and fair investigation" allowed Defendants to point to arguably superficially plausible indicia of guilt that would have unraveled under further scrutiny.  *See, e.g.*, *infra* pp. 43–45 (discussing alleged "circumstantial" evidence that on fuller examination turns out to be entirely innocent).

Third, though the final instruction did refer to probable cause as "an objective standard" involving the "reasonable belief" of "a reasonable person" (7/18/14 Tr. at 229:20–25), more express direction was required so the jury would understand that in making its assessment of probable cause it was not to consider what "these defendants or the prosecutor personally believed."  7/17/14 AM Tr. at 188:30–23, 189:24 to 190:4.  The scant reference to an "objective standard" was not enough, especially because Defendants repeatedly testified that they believed that there was probable cause or that Moore was guilty, as did Valder and two of his supervisors in the U.S. Attorney's Office.  *See, e.g.*, Hartman Designations (Dkt. 493-1) at 48:10–14, 62:21 to 63:1, 66:12–15, 84:11–18, 105:21 to 106:1; 7/1/14 AM Tr. at 33:18–25; Valder Designations (Dkt. 488-1) at 98:17–18; 7/16/14 PM Tr. at 96:10–18, 99:23–24; 7/17/14 AM Tr. at 144:23 to 145:1, 153:7–8; 7/10/14 AM Tr. at 61:7–12 , 65:8–12, 68:16–18.  While such evidence was arguably relevant to punitive damages, the jury should have been instructed that it was not probative of probable cause, which is a truly objective standard.

These errors—which were magnified by the admission of, and failure to instruct the jury how to consider, the plethora of improper hearsay evidence—also impacted the jury's verdict on the other elements of Moore's claim.  Any error that prejudiced the probable cause determination

necessarily impacted the retaliatory motive determination as well, since the presence or absence of probable cause permits the jury to draw inferences about the presence or absence of improper motive. *See Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010) ("it is long-settled that the lack of probable cause may give rise to an inference of malice"). Likewise, as to inducement, the jury will have been substantially more inclined to find that the charges would have been filed in any event if it mistakenly concluded that there was probable cause for the charges.

### F.     The Court Erred in Excluding Judge Revercomb's Opinion

The Court also prejudicially erred by granting defendants' pretrial motion to exclude all references to Judge Revercomb's decision and analysis in the criminal case pursuant to Rule 403. *See* 6/17/14 Hr'g Tr. at 57–66. Judge Revercomb's harsh assessment of the strength of the case against Moore was highly relevant to probable cause because it demonstrated that government's evidence was abysmally weak, and showing how the judge who heard the evidence actually assessed it would have served as a powerful counterpoint to Justice Department officials Jarrett and Knight telling the jury at length how they assessed it. The evidence was also highly relevant to retaliatory motive because a jury is always permitted to infer improper motives from the decision to proceed with a baseless case. *See Cameron*, 598 F.3d at 69. And it was likewise highly relevant to inducement because a jury would be much less likely to find that the prosecutor would have filed the charges anyway if the jury believes that the charges lacked merit. Any concern that the jurors might have been unduly influenced by the conclusions of a judge could have been addressed by an instruction not to give the evidence undue weight.

### G.     The Court's Inducement Instruction Was Incorrect

Over Moore's objection, the Court instructed the jury that inducement means "convinc[ing] another … to do something that he or she would not have otherwise done," and that Moore was required to prove that the defendants "induced the prosecutor to file criminal

charges" and that "the prosecutor would not have filed the charges without that inducement." 7/18/14 Tr. at 227:20 to 228:3.  These instructions, along with the two related special-verdict interrogatories, were error:  a plaintiff who proves retaliatory motive on the part of the official urging prosecution coupled with the absence of probable cause for the charges need not further prove that the charges would not otherwise have been filed.[11]

In *Hartman*, the Supreme Court addressed "the distinct problem of causation" where a plaintiff alleges that a criminal prosecution resulted from a non-prosecuting official's retaliatory animus.  547 U.S. 250, 262–63 (2006).  Given "the factual difficulty of divining the influence of an investigator or other law enforcement officer upon the prosecutor's mind," *id.* at 263, the Court chose not to leave "this distinct causation concern" to be worked out through "such … proof as the circumstances allow," *id.* at 264.  Instead, the Court "structur[ed the] cause of action" to "address the issue of causation" by requiring the plaintiff to prove the lack of probable cause, *id.* at 264–65, reasoning that because prosecutors do not generally pursue baseless charges, such a showing will "bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action," *id.* at 263.  It follows that a plaintiff establishes causation by proving the absence of probable cause.  There is no basis for requiring the plaintiff to then prove the same fact again, through the very case-by-case factual inquiry into "the prosecutor's mind" that Supreme Court rejected in favor of an objective inquiry into probable cause.

This is certainly how the D.C. Circuit understood *Hartman*, describing the no-probable-cause requirement as "a special rule of proof…—one which requires that the plaintiff establish

---

[11]  Both of the specific interrogatories on this subject incorporated the premise that Moore needed to prove that the prosecutor would not otherwise have brought charges.  This overlap appears to have confused the jury, which submitted a note stating its "understand[ing]" that Question 3 is "dependent" on Question 2, and that "[i]f there is a finding of 'no' on number 2, it appears that only a finding of 'no' would be possible for #3."  Note from Jury #2 (Dkt. 504).

causation by proving the absence of probable cause." *Moore v. Hartman*, 644 F.3d 415, 424 (D.C. Cir. 2011) ("*Moore V*"); *see also id.* at 425 (plaintiff's "ability vel non to plead and prove the absence of probable cause" determines "whether he has made a showing of causation through the specific means the court mandates"). Thus, if a plaintiff proves the absence of probable cause, he has necessarily "establish[ed]" causation. *Id.* That is why the D.C. Circuit did not, after *Hartman*, include causation in its enumeration of the elements that Moore must prove. *See id.* at 420; *Moore v. Hartman*, 571 F.3d 62, 65 (D.C. Cir. 2009) ("*Moore IV*").

During the charging conference, the Court sought to justify its instruction by emphasizing that *Hartman* and *Moore V* require "a combination of retaliatory animus and lack of probable cause." 7/17/14 AM Tr. at 178:8–17; *accord id.* at 179:24 to 180:1; 7/17/14 PM Tr. at 9. But this is not responsive to Moore's objection to the instruction. Moore is not (and was not) contending that he need not prove both retaliatory animus and the absence of probable cause, but only that he need not further prove causation—*i.e.*, that "the prosecutor would not [otherwise] have filed the charges"—*on top of* the elements of retaliatory animus and no probable cause.[12]

Indeed, in other language quoted by this Court, *Hartman* made clear that a retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision to go forward are "enough" for a prima facie inference that the unconstitutionally motivated inducement infected the prosecutor's decision to bring the charge. 7/17/14 PM Tr. at 9 (quoting *Hartman*, 547 U.S. at 265). In other words, a plaintiff

---

[12] This Court also cited the Supreme Court's observation that the absence of probable cause "is not necessarily dispositive, 'showing an absence of probable cause may not be conclusive that the inducement succeeded[, a]nd showing its presence does not guarantee that inducement was not the but-for fact in a prosecutor's decision." 7/17/14 PM Tr. at 8:24 to 9:3 (quoting *Hartman*, 547 U.S. at 265); *see also* 7/10/14 AM Tr. at 10:13–19. But the Supreme Court in this passage was plainly addressing—and rejecting—a counter-argument to the use of the absence of probable cause as a proxy for causation, hence its conclusion that the existence of probable cause will bar a claim even though it "does not guarantee" that the claim lacks merit.

need not prove anything else.  That is consistent with the pre-*Hartman* law, which (before *Hartman* added the absence of probable cause as an additional element) placed on the defendant, not the plaintiff, the burden of proving that the prosecutor would have brought the charges anyway.  *See Moore v. Hartman*, 388 F.3d 871, 877–78 (D.C. Cir. 2004) ("*Moore III*") (if a plaintiff proves that criminal prosecution "was motivated at least in part by a purpose to retaliate," the court should ask "whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered" (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1257 n.93 (D.C. Cir. 1987)); *see also Mt. Healthy City Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (outside prosecution context, once plaintiff proves retaliatory animus was a "motivating factor" in adverse decision, burden shifts to defendant to show "it would have reached the same decision … even in the absence of the protected conduct").

Accordingly, the jury should not have been told that Moore had to prove the inspectors "induced" the bringing of criminal charges and "the prosecutor would not have filed the charges without th[e] inducement."  The jury's findings (in its answers to Questions 2 and 3) that Moore failed to do so are therefore (at a minimum) legally irrelevant, and cannot render harmless the instructional and evidentiary errors impacting the other elements of Moore's claim.  Moreover, by requiring the jury to assess this extraneous inducement factor (and, confusingly, to do so twice, *see supra* note 11), and thereby giving Defendants two extra opportunities to get a winning answer on the special verdict form, this erroneous instruction necessarily had a prejudicial impact upon the jury's consideration of the entire case.

## H.   The Court Should Have Excluded Irrelevant, Inflammatory Evidence About the Race-Based Admissions of Moore's Country Club

The Court erred in admitting irrelevant and unfairly prejudicial evidence about the Dallas

Country Club's alleged exclusionary, race-based admission policies.  Defendants used this line

of inquiry to improperly suggest that Moore somehow shared or endorsed the beliefs reflected in

policies that defense counsel described in assertions made in his questions.  This inference of

racism created unfair prejudice with members of the jury, impermissibly tainting the entire trial

and depriving Moore of his right to a fair trial.

Defendants first elicited testimony, over objection, that Moore was a member of the

Dallas Country Club during Moore's cross-examination.  6/25/14 PM Tr. at 14:23 to 16:8.  After

the Court allowed this evidence as relevant to Moore's reputational injury, defense counsel

sought to exploit that ruling to inject inflammatory insinuations into the case.  During the cross-

examination of Roger Staubach, Defendants revisited the membership more broadly and

improperly.  They first asked Staubach about social clubs to which he and Moore both belonged.

7/9/14 AM Tr. at 27:15–16.  Staubach identified clubs affiliated with the Catholic schools their

respective children attended.  *Id.* at 27:17–21.  Defendants then pointedly asked if Staubach was

a member of the Dallas Country Club.  *Id.* at 27:22–23.  Staubach—who moved to Dallas in

1969, twenty years before Moore joined the Dallas Country Club—replied he was not,

explaining he "wasn't crazy about its lack of allowing just the right people in there."  *Id.* at 27:25

to 28:1; *see also id.* at 14:5–11; 6/25/14 PM Tr. at 15:6–9.  No specifics were given about this

practice or when it existed.  That should have been the end of the matter:  Staubach's reply that

he was not a member of the club rendered further questioning on the topic irrelevant.

Defendants, however, sought to capitalize on Staubach's explanation for refusing to join

the Dallas Country Club as an opportunity to imply that, because Moore was a member, he

shared the club's asserted exclusionary beliefs.  Instead of moving away from the topic,

Defendants belabored it, first eliciting that Staubach's initial vague response was a reference to

the club at one time refusing to admit minorities, *see id.* at 28:3–6, then asking if Staubach knew that Moore was a member without reference to when Moore became a member, *see id.* at 28:7–9, then eliciting for a second time the fact that Staubach refused to join because the club excluded minorities, *id.* at 28:16–18, then again asking Staubach—even after he had said he "didn't know" whether Moore was a member—to confirm that Moore was a member, *id.* at 28:19–22.  As a whole, this line of questioning created—and was plainly designed to create—an inference that Moore somehow shared or endorsed exclusionary beliefs as assertedly reflected in the club's policies twenty-five or more years ago.  After moving onto a different line of questioning, Defendants returned again to the topic of the Dallas Country Club. *Id.* at 31:18–19.  At this point in time, Moore's counsel objected to this line of questioning.  *Id.* at 31:20–21.  Clearly, defense counsel from the Department of Justice had seized on the witness's comment about why he had not joined the club and turned it into a vehicle to try to inject race considerations into the case in front of a predominantly minority jury.[13]

"Undeniably, prosecutorial remarks kindling racial or ethnic predilections can violently affect a juror's impartiality." *United States v. Doe*, 903 F.2d 16, 28 (D.C. Cir. 1990) (ordering new trial in criminal case where prosecutor's comments stoked racial resentment).  For this reason, evidence of a party's alleged political or social views should be excluded when it lacks relevance to matters in dispute and risks creating unfair prejudice. *See Am. Heartland Port, Inc.*

---

[13] Having unsuccessfully objected on relevance grounds to questions about Moore's Dallas Country Club membership earlier in the trial, *see* 6/25/14 PM Tr. at 14:23 to 15:3, it was not necessary for Moore to renew that objection when defense counsel began questioning Staubach on the subject.  *See* Fed. R. Evid. 103(b).  Once the extent to which Defendants' intent to revisit and exploit this issue became clear, Moore's counsel again objected, specifically mentioning (at a side bar) that the defense was playing the race card, but the Court categorically denied any relief.  7/9/14 AM Tr. at 32:2 to 34:15.  Defense counsel's questioning was of such an inflammatory type that the Court should have controlled the examination. *See, e.g.*, *United States v. Zarra*, 298 F. Supp. 1074, 1085–86 (M.D. Pa. 1969).

*v. Am. Port Holdings, Inc.*, 2014 U.S. Dist. LEXIS 88374, *2–5 (N.D. W. Va. June 30, 2014);

*Owens v. Alabama Dep't of Mental Health & Mental Retardation*, 2008 U.S. Dist. LEXIS

85906, *7–8 (M.D. Al. Oct. 22, 2008) (excluding evidence of membership in certain

organizations and groups for the purpose of "creat[ing] an inference of racism").  No fact

concerning the Dallas Country Club's admissions policies in 1969—or at any other time—was of

consequence to the determination of this action.  The club's undefined admission policies had

nothing to do with the liability of any of the inspectors or with the measure of damages.

Defendants' questioning—seeking to impute the club's alleged admissions policies to Moore—

was highly inflammatory and almost certainly prejudiced this racially diverse jury against

Moore, thereby depriving him of a fair trial and requiring a new trial.  *See Doe*, 903 F.2d at 28;

*Bird v. Glacier Electric Coop. Inc.*, 255 F.3d 1136, 1152 (9th Cir. 2001) (counsel's

"inflammatory appeal to racial bias" requires new trial).

I.      **The Court Erred in *Sua Sponte* Delivering Improper Instructions the Jury
        That Undermined the Effectiveness of Moore's Case**

The Court erred by *sua sponte* delivering improper instructions that gave the jury the

incorrect impression that Moore's counsel had done something improper, thereby undermining

the effectiveness of Moore's presentation and prejudicing the jury against Moore.

Most notably, during his summation, in the context of discussing punitive damages,

Moore's counsel made reference to jurors "mak[ing] a big statement … speaking for the

community and the system [as to] what kind of behavior they will, won't, or want tolerated by

law enforcement people."  7/18/14 Tr. at 127:2–6.  Moore's counsel explained punitive damages

as a mechanism for getting people's attention, holding law enforcement accountable, ultimately

stating, "[t]he verdict here, including the punitive damages, [is] an opportunity to make a

statement that is valuable to [the community]."  *Id.* at 127:7 to 128:18.

Following the conclusion of Moore's summation, the Court requested that counsel for both parties approach the bench. *Id.* at 129:2–4. During the bench conference, the Court, citing a 2013 D.C. Circuit decision (referred to in the transcript as "U.S. v. Cole" but believed to be *Caudle v. District of Columbia*) *sua sponte* stated that counsel's summation "crossed the line" by making "inappropriate … arguments" to "send a message" and appealing to the Golden Rule. *Id.* at 129:20 to 130:3. At no time during Moore's summation did Defendants object on those grounds, a fact which the Court acknowledged. *See id.* at 130:6–7 ("But [Defendants] were not standing up and objecting."). In fact the only curative instruction Defendants had requested up to this point was, "[t]o remind the jurors that, before our closing statement, that we do not have a burden of proof [as to probable cause]." *Id.* at 131:1–3. The Court recognized that "[Defendants are] thinking of something different than I am" and reiterated that the Court was "talking about specifically . . . send[ing] a message." *Id.* at 131:4–6. It was not until this point that Defendants grabbed onto the Court's suggestion and decided to request a curative instruction on those grounds. *Id.* at 131:7–18. Once the jury returned from break, the Court instructed the jurors:

> Ladies and gentlemen, you heard arguments in the summation on behalf of the plaintiff in this case referring to sending a message and appealing to your emotions. You're gonna be instructed on the law in this case and, as I instructed you during the preliminary instructions, you are to decide this case without bias, emotion, sympathy or personal interest, and to decide this case based on the evidence presented in this case and the law as I will instruct you, not on the basis of sending a message or on the basis of any emotions.

*Id.* at 133:12–23.

The Court erred as a matter of law in making this instruction. *Caudle* disapproves of "send a message" and Golden Rule arguments, but that case, unlike this one, did not involve a claim for punitive damages. *See* 707 F.3d at 357. "Reminding the jury that they have the capacity to deter defendants and others similarly situated is certainly legitimate where punitive damages are at stake." *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 519 (9th Cir. 2004); *see*

*also King v. Macri*, 993 F.2d 294, 298 (2d Cir. 1993); *Porter v. Cabral*, 2007 U.S. Dist. LEXIS 12306, *22 (D. Mass. Feb. 21, 2007); *Nice v. ZHRI, Inc.*, 105 F. Supp. 2d 1028, 1029 (E.D. Ark. 2000).  Having sought punitive damages, it was entirely appropriate for Moore's counsel to argue that jurors "send a message" with an award of punitive damages.  The Court seemed not to have been aware that *Caudle* considered an argument where the jury was not going to address punitive damages.  The Court thus erred with its *sua sponte* instruction to the jury.  The instruction was unwarranted and harmed Moore by implying that counsel had acted improperly.

This was not the only occasion where the Court effectively rebuked Moore's counsel by making statements to the jury that implied that Moore's counsel had acted inappropriately.  After the first portions of Hartman's depositions were read to the jury, the Court "raise[d] [its] puzzlement" that no objections were raised to "so many of the statements during the course of the deposition that [were] so objectionable."  7/7/14 AM Tr. at 122:4–22.[14]  Upon returning from the lunch break, the Court *sua sponte* asked Defendants whether they "want a reminder to [the jury] that the questions of Counsel are not evidence and that [the jurors] have to—the only evidence before them is what the witness responds."  7/7/14 PM Tr. at 3:7–10.  Defense counsel readily agreed.  *Id.* at 3:11.  The Court overruled Moore's objection to the instruction, and gave it to the jury.  *Id.* at 3:12–20, 4:7–13.[15]

---

[14] Defendants had raised *no* objections to any specific designations of their prior deposition testimony, preferring to rest solely on their (unwarranted) universal objection to the introduction of any of that testimony.  Joint Pretrial Stmt (Dkt. 438-5) at 21, 37–38, 44–45, 54.  As Moore's case-in-chief progressed, the Court clearly became frustrated with Defendants' strategy.  *See* 7/7/14 AM Tr. at 122:15–20 ("this is a little frustrating … when I'm hearing such objectionable questions"); 7/8/14 AM Tr. at 68:10–14 ("We have had hour after hour after hour of the most objectionable leading questions.").

[15] The Court intervened to Moore's detriment on other occasions as well, frequently questioning witnesses in ways helpful to the defense.  *See* 6/26/14 PM Tr. at 102 (eliciting from Betsey the possibility that his calculations were flawed beyond the two years cited by defense counsel during cross-examination); 6/30/14 AM Tr. 83:1–12 (eliciting from Bray that he knew

All this served to prejudice the jury against Moore.  The instruction read immediately following Moore's summation was a rebuke at a critically important stage of the trial suggesting that counsel had acted improperly, and it undermined the overall effectiveness of the summation. Criticizing Moore's deposition examination of Hartman likewise undermined the effectiveness of Moore's case by suggesting the deposition designations were an illegitimate or improper means of presenting testimony.  Overall, the instructions and questions had the presumably unintended but nonetheless significant effect of assisting defense counsel in front of the jury where defense counsel did not do something that the Court apparently thought should have been done.

## II.    THE JURY'S VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE

Even apart from any legal error, a new trial should be granted because the jury's verdict is against the great weight of the evidence.  "The trial judge in the federal system … has discretion to grant a new trial if the verdict appears to the judge to be against the weight of the evidence."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (internal marks, ellipsis and brackets omitted); *accord* 11 Wright & Miller, *supra*, § 2806; *Lewis v. Elliott*, 628 F. Supp. 512, 516 (D.D.C. 1986); *Thompson v. Int'l Ass'n of Machinists & Aerospace Workers*, 614 F. Supp. 1002, 1013 (D.D.C. 1985).  "On a motion for a new trial [on this basis]—unlike a motion for a judgment as a matter of law—the judge may set aside the verdict even though there

---

(continued…)

Reedy's response to the question was incorrect and did not react); 7/15/14 PM Tr. at 20:5 to 21:4 (eliciting from Kormann that Gnau's summary statement included the functional equivalent that Gnau did not tell Moore and Reedy of the kickback scheme); 7/9/14 PM Tr. at 89:24 to 90:19 (eliciting from Stillman that summary statements would be helpful to "see [what is going to be presented to the grand jury] before the witness enters the grand jury"); 7/11/14 AM Tr. 32:24 to 33:2 (eliciting from Hartman that summary statements were the "only easily legible compilation of all of your notes of the interviews"); 7/17/14 AM Tr. at 73:1–6 (eliciting from Valder that this was the only case in which a defense lawyer complained about the use of summary statements); 7/17/14 AM Tr. at 151:10-24 (eliciting from Knight that summary statements "solve" any curiosity that the attorney and witness might have about questions before the grand jury).

is substantial evidence to support it." 11 Wright & Miller, *supra*, at § 2806 (citing cases); *see also Tibbs v. Florida*, 457 U.S. 31, 37–38 & n.11 (1982) (explaining the difference between "weight of the evidence" and "sufficiency of the evidence"). The court need not view the evidence in the light most favorable to the party that won the verdict, but may "assess[] the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011); *accord United States v. Dale*, 991 F.2d 819, 838 (D.C. Cir. 1993); 11 Wright & Miller, *supra*, § 2806. Though the court should be mindful of its duty not to simply substitute its judgment for that of the jury, it should nevertheless order a new trial if it has a "definite and firm conviction" that a mistake has been committed. *Lewis*, 628 F. Supp. at 516 (quoting 11 Wright & Miller, *supra*, at § 2806). These criteria are satisfied here.[16]

A.     **The Jury's Verdict on Retaliatory Motive Is Against the Great Weight of the "Smoking Gun" Evidence Adduced by Moore**

The jury's verdict that the inspectors' actions were not motivated, at least in part, by a desire to punish Moore for the exercise of his First Amendment rights is not only against the great weight of the evidence, it is inexplicable. The record contains multiple documents written by the inspectors impermissibly citing Moore's constitutionally protected activity as a basis for pursuing charges against him, and the inspectors admitted at trial that they did in fact target such activity. This evidence of retaliatory motive is "disturbing[]," 7/10/14 AM Tr. at 15:14, and "comes close to the proverbial smoking gun," *Moore III*, 388 F.3d at 884. It ought to give rise to a definite and firm conviction that the jury made a serious mistake in evaluating the evidence.

As Paul Carlin testified, "[t]here was general animosity throughout the organization in

_____

[16] To supplement the discussion herein, Moore relies on and incorporates by reference his proposed findings of fact on the FTCA claim. Evidence that should have been excluded should be disregarded in considering the weight of the evidence, and evidence admitted for a limited purpose (*e.g.*, the Spartin, Marcus, and Gnau statements) should be used in considering the weight of the evidence only to the extent of that limited purpose.

postal management" including "against Recognition Equipment" and Bill Moore, resulting from

Moore's lobbying activities.  7/8/14 AM Tr. at 120:16–17, 126:22–24; *see also, e.g.*, 7/1/14 PM

Tr. at 18, 22–24; Edwards Designations (Dkt. 497-1) at 177:14 to 178:12, 188:5–10, 419:15–21;

PE 229 at DOJ0000047; Hartman Designations (Dkt. 493-1) at 33:22 to 34:15; PE 92.  The

inspectors at trial testified glibly that this general animosity did not influence their own motives,

but the great weight of the evidence is to the contrary.  Over and over again, Defendants' own

testimony and documents make clear that they viewed Moore's constitutionally protected efforts

to use political pressure to win a contract and (allegedly) effect personnel change within the

Postal Service to be a valid basis for the criminal charges against him.

For instance, the "Arguments for Indicting the Corporation" memo drafted by Hartman

and Kormann candidly cites Moore's lobbying as the *first* justification for indicting REI:

> *Independent of Voss/GAI actions*, the corporation and its PAC funded a media and
> political campaign to discredit USPS management and cause financial harm to
> USPS, for example
>
> > a.  staged questions and testimony before Congress
> >
> > b.  Frost amendment to freeze USPS appropriations bill.

PE 295 at SMFC3 09861 (emphasis added); *see also* 7/11/14 AM Tr. at 95:22 to 96:6.

Similarly, in a memorandum purporting to identify the details of Moore's alleged offense,

Hartman and Kormann wrote that "Moore's … intent to defraud the USPS is evident in," among

other things, the following protected First Amendment activities:

> - On or about July 25, 1985, at Moore's and Reedy's suggestion and with
>   their substantial input relative to its drafting, Congressman Frost proposed
>   an amendment to a USPS appropriate (sic) bill that in effect would freeze
>   USPS revenue until MLOCRs were purchased from REI.
>
> - During the period August 1985 to April 1986, REI continued to undermine
>   the competitive testing program via the media and Congress.

PE 291 at SMFC4 00019.  The rest of the "Details of Offense" memorandum is similarly

peppered with references to Moore's and REI's protected lobbying activities, *see, e.g., id.* at

SMFC4 00006–07; *id.* at SMFC4 00022–23; *id.* at SMFC4 00072; *id.* at SMFC4 00090, and the

inspectors at trial continued to view this activity as criminal.  *See, e.g.*, 7/10/14 PM Tr. at

112:12–14 (pointing to "a lot of things that happened at Congress").[17]

Other evidence likewise showed the inspectors' contempt for, and desire to punish,

Moore's alleged advocacy for the removal of Carlin and Jellison and the appointment of Albert

Casey, activities plainly protected by the First Amendment.[18]  *See, e.g.*, Hartman Designations

(Dkt. 493-1) at 130:15 to 133:8 ("REI agreed to compete, and they were seeking to influence

Paul Carlin to award sole source contracts or if he didn't to remove Paul Carlin or Jim Jellison or

whoever else was standing in their way, and one of the tools to do that is congress"); *id.* at

137:20 to 138:6; 7/11/14 AM Tr. at 17:3–24, 18:12–15; 7/11/14 PM Tr. at 22:17–19 ("Certainly

the subject of the removal of Paul Carlin as an object of the conspiracy was in that indictment.");

*id.* at 24:1–5; *id.* at 28:18–24 ("[I]f you have an object to remove the Postmaster General in order

to get a sole source award, then you have a decision to make.  Do you want to stay in the

---

[17] Other evidence showed the inspectors' investigating Moore's First Amendment conduct.  For example, the "Investigative Strategies" memo sets out a plan to find evidence of misconduct in "communications with … Congressional subcommittees and individual Senators and members of Congress."  PE 107 at SMFC4 00216.  The inspectors drafted and obtained grand jury subpoenas demanding from REI records concerning political contributions, "meetings with United States Congressmen," "articles placed with trade publications and reporters," and "interviews with journalists and reporters."  PE 183 at SMFC3 09159, SMFC3 09281–82.  *See also* DX 51 at 2 ("Create a compete subject file, i.e., Congressional testimony, REI correspondence, etc.").

[18] "Carlin, Jellison and Strange were public employees and REI, as a taxpaying member of the American public, was entitled to criticize—and criticize hard—what it viewed to be the ineffective policy of USPS management in the OCR debate.  [Moore and REI] were entitled to tell the world that they viewed Carlin, Jellison and Strange as obstacles not only to REI but to the USPS itself."  *United States v. Recognition Equip. Inc.*, 725 F. Supp. 587, 600 (D.D.C, 1989); *see also* PE 311 (6/1/88 Knight/Leeper memo) at 9 (doubting whether "a competitor's recommendation of a candidate … rise[s] to a criminal level").

conspiracy or do you want to notify the appropriate authority that people are conspiring to remove the Postmaster General").  In one particularly revealing example, Hartman cited as "material" to the criminal proceedings the fact that, "Moore and REI publicly criticized Carlin's management of the MLOCR procurement" and "Moore publicly expressed his favor of Carlin's removal and Casey's appointment."  PE 335 at 004085, 004087.  This memo, which argues for harsher terms of Moore's suspension from his job following the indictment, dramatically shows the Hartman's continuing animus towards Moore even after Moore had been indicted.

The inspectors also sought to punish Moore for his constitutionally protected advocacy for, and discussions with AEG about, a split government procurement, whereby REI would get a "sole source" contract for new multi-line machines, while AEG/ECA would get a "sole source" contract to retrofit the existing single-line machines.  *See United Mine Works of Am. v. Pennington*, 381 US 657, 670 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition.  Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act."); *see also Feld Entm't, Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 306 (D.D.C. 2012) (*Noerr-Pennington* doctrine immunizes petitioning activity from "statutory liability").  Indeed, the inspectors openly admitted that they indicted Moore in part because he had discussed with AEG officials the possibility of attempting jointly to persuade the USPS to follow a split procurement.  PE 107 at SMFC 00238 ("The fact that REI attempted to strike a deal with AEG to split the contracts is further evidence of that scheme to defraud."); 6/24/14 AM Tr. at 69:6–7 ("Such a proposal to split the contracts would be illegal.").  This was done even though an OTA Report had suggested that as an option, the option was being publicly debated in the Postal Service and Congress, and the Postal Service itself had told REI to meet with the

competitor.  *See* PE 25 at 002696–99; PE 92 at SMFC410278, SMFC410285; PE 93; 6/30/14

AM Tr. at 69:8 to 70:8, 73:2–18, 79:5–8; 7/11/14 PM Tr. at 62:16 to 64:1, 69:2–13.

All in all, the evidence that a desire to punish Moore for his constitutionally protected

conduct played at least a part in Defendants' motivations is overwhelming, cannot be explained

away, and in some instances was embraced by Defendants at trial.  Because the jury concluded

otherwise, a new trial is warranted.

> **B.   The Jury's Verdict on Inducement Is Both Irrelevant and Against the Great Weight of the Evidence**

The Court's special verdict form included two related and overlapping questions

concerning whether Moore had established inducement by proving that the prosecutor would not

have filed the charges absent the inspectors' conduct.  As explained, requiring Moore to prove

this fact as an element of his claim was legal error.  *See supra* Part I.G.  The jury's conclusion

that Moore failed to prove inducement is therefore irrelevant to Moore's motion for a new trial.

In any event, the jury's answers to the inducement questions are also against the great weight of

the evidence.  On this record, it cannot be seriously disputed that the inspectors intentionally

took actions to convince the prosecutor to do something (indict Moore) that he would not have

otherwise done, and that the prosecutor would not have filed the charges without those actions.

It is essentially undisputed that the inspectors initiated the investigation and targeted

Moore and REI before they became aware either that a crime had been committed or of the

Voss-Gnau scheme.  From the start, they focused on political activity, tried to get an antitrust

grand jury empanelled and later reported their preliminary findings to the U.S. Attorney's Office

in connection with another, then-successful request for a grand jury, *see, e.g.*, DX 54; 7/14/14

AM Tr. at 14:15–17, 21–24; DX 55; 7/10/14 PM Tr. at 80:14–22; *id.* at 82:4–15; *id.* at 86:20–23;

DX 235, gathered and presented to the U.S. Attorney's Office additional evidence through

witness interviews and grand-jury document subpoenas, *see, e.g.*, 7/10/14 PM Tr. at 108:11–20,

prepared detailed memoranda for prosecutors that summarized the evidence, *see, e.g.*, DX 1;

7/10/14 PM Tr. at 108:21 to 109:6; DX 2; 7/11/14 AM Tr. at 103:17– 24, 106:7–14; PE 295;

7/11/14 AM Tr. at 109:1 to 110:5, 116:24 to 117:1, drafted the witness statements used in the

grand jury, *see, e.g.*, 7/10/14 PM Tr. at 113:23 to 115:10; 7/11/14 AM Tr. at 6:1–25, 9:11–23,

11:8–13, and drafted the indictment, *see, e.g.*, 7/11/14 PM Tr. at 108:23–25.  As Valder testified,

he relied on the inspectors in order to do his own job, *see* Valder Designations (Dkt. 488-1) at

150:9 to 151:9; 7/17/14 AM Tr. at 95:14 to 97:20, and could not have "do[ne] [his] job separate

and distinct from theirs without each other doing their own jobs."  7/17/14 AM Tr. at 97:18–20;

*see also* 7/2/14 AM Tr. at 82:17–18 ("Mr. Valder and the two senior agents [Hartman and

Kormann] were pretty much a team"); 7/10/14 PM Tr. at 87:8–12 (Hartman: "[i]t was a joint

investigation").  Similarly, officials in the U.S. Attorney's Office (Jarrett, Leeper, Knight)

testified that they, and U.S. Attorney Stephens—who made the ultimate decision whether to

indict, *see* 7/2/14 AM Tr. at 45:23–25, 66:5–6—relied on the work product and opinions of the

inspectors and Valder in making their determination.  *See, e.g.*, DX 10 at 1; 7/2/14 AM Tr. at

43:11 to 45:9; 7/10/14 AM Tr. at 64:14–20, 67:3–11; 7/17/14 AM Tr. at 152:11–24, 159:8–17.

The inspectors also attended meetings with the review team and "spoke forcefully" in advocating

for an indictment.  7/2/14 AM Tr. at 123:10–25; *see also* 7/17/14 AM Tr. at 127:9 to 128:8,

145:19–22, 152:25 to 153:24, 161:1–11; 7/11/14 AM Tr. at 121:18 to 122:14.  And Hartman

drafted two sharply worded letters signed by Chief Inspector Clauson pressing an indictment

decision.  *See* PE 309.  This was a far cry from neutral law enforcement personnel gathering

evidence in an objective fashion and turning it over to a prosecutor.

   This evidence unequivocally establishes that, without the inspectors' conduct, there

would have been no investigation, no grand jury, and no prosecution.  Simply put, there was no

case without them.  Therefore, the inspectors "induced the brining of criminal charges," and

Moore "would not have been charged in an indictment without the inducement of" the

inspectors.  The jury's contrary finding is against the great weight of the evidence.

> **C.      The Jury's Verdict on Probable Cause Is Against the Great Weight of the Evidence and Is Also Wrong as a Matter of Law**

It is now incumbent on the Court to review the evidence carefully to decide whether the

jury's verdict on probable cause is against the weight of the evidence or wrong as a matter of

law.  *See Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007) (probable cause is a

mixed question of fact and law).  Moore respectfully suggests that this analysis should be done in

the following fashion.  First, as the jury instructions recognize, the benchmark against which the

evidence is to be measured is whether Moore had actual knowledge of the unlawful conspiracy

to bribe Voss *and* knowingly joined in that conspiracy.  *See* 7/18/14 Tr. at 228:22 to 299:4,

229:9–10.  This is a two part assessment.  On the first point, the evidence does not show actual

knowledge.  Moore's actions, even when viewed as Defendants presented them, add up to no

more than Moore should have known or should have been more suspicious.  On the second

point—did he join the conspiracy?—there is no evidence that he joined and his actions were

inconsistent with being part of the scheme.  It is highly significant that Defendant Edwards

admitted that when he left the task force in early 1987, "there was not sufficient evidence" of

Moore's guilt.  Edwards Designations (Dkt. 497-1) at 546:14–22.  Nothing happened after that in

terms of finding new evidence except the eliciting of the bogus opinion from Spartin.

Beyond keeping the focus on the two central points—actual knowledge and joining—the

analysis must begin with the acknowledgment that the conspirators, who had no incentive to

protect Moore, all maintained after hours upon hours of interview sessions that they never told

Moore.  And there was no way Moore could have known *except* through the conspirators.  That speaks volumes.  The question, then, is whether the "circumstantial evidence" Defendants now cite can overcome their failure after many tries to directly tie Moore into the scheme.

In describing this purported evidence at trial, Defendants used the term "suspicious" frequently.  Suspicions may be a justification for continuing an investigation when it seemed that the trail ended, but suspicions and innuendos do not rise to the level of probable cause to indict. As Judge Revercomb recognized, "[m]uch of what the government characterizes as incriminatory evidence is not persuasive of guilt when viewed in its full context."  *REI*, 725 F. Supp. at 588.  Much of that evidence, in fact, "is exculpatory and points to innocent conduct." *Id.*  Out-of-context snippets from notebooks that do not indicate whether Moore was writing what he was thinking or quoting what he or someone else said do not support probable cause. Perfectly innocent snippets like "the business to be had is substantial" or "consultant wired" add up to nothing.  Missing notebook pages are not suggestive of guilt when hundreds and hundreds of pages during all time periods were produced in one notebook or another.  Phone logs that only tell the numbers connected and the duration of the connection, without showing who was actually on the line much less what was said are not evidence to support probable cause.  What Reedy said and did is not probative of Moore's guilt.

Moore respectfully urges the Court to look at each piece of alleged circumstantial evidence and assess whether it truly is substance or suspicion, and whether it overcomes the substantial direct evidence showing the absence of knowledge and participation by Moore.  This process will demonstrate that the finding that there was probable cause was against the great weight of the evidence and, indeed, that probable cause was absent here as a matter of law.

To begin, the most telling evidence in the inspectors' possession came directly from the

five admitted members of the conspiracy (Voss, Gnau, Marcus, Spartin, and Peterson), all of whom had entered into plea or non-prosecution agreements requiring truthful and honest cooperation with investigators, and all of whom would have been exposed to further punishment and/or revocation of their plea agreements for failure to cooperate.  *See* PE 165 at SMFC3 11391–92; PE 208 at SMFC3 11464–65; PE 213 at SMFC3 11580–81; PE 269 at 4:13 to 5:18; PE 201 at SMFC3 11604–05.  During many hours of interviews,[19] the inspectors repeatedly pressed the conspirators to implicate Moore, but again and again the conspirators informed the inspectors that they never told Moore (or anyone else at REI) about the payment conspiracy. *See, e.g.*, Kormann Designations (Dkt. 489-1) at 133:2 to 134:13, 136:4 to 136:15; 7/7/14 AM Tr. at 49:19–24, 67:23 to 68:1; 7/11/14 AM Tr. at 40:22–25.  Voss, the ring leader who had "spilled his guts" to the inspectors (Edwards Designations (Dkt. 497-1) at 516:13 to 517:10), told them that there was "no way Moore knew" about the payoff conspiracy.  PE 300; *see also* 7/17/14 AM Tr. at 103:8 to 108:3; PE 311 at DOJOPR000365 ("Our case has been even further weakened by Peter Voss who, after great reflection while sitting in a federal prison camp, recently stated to Postal Service investigators that REI, Moore and Reedy knew nothing of the conspiracy.").  Spartin was asked repeatedly during a polygraph examination whether Moore knew of the payments to Voss, *see* PE 226; his responses that Moore did not know were found truthful by the polygrapher, *see* PE 398; Robbins Designations (Dkt. 489-2) at 71:3–13.[20]

---

[19] *See* Voss Designations (Dkt. 487-1) at 42:20–23; 7/7/14 AM Tr. at 48:1–5, 49:2–5; DX 154; PE 535 at SMFC3 10022; PE 137 at WM 007876; 7/11/14 PM Tr. at 48:18–23.

[20] The inspectors also had a non-prosecution and cooperation agreement with REI employee Frank Bray (*see* PE 255), who in Inspector Edwards's judgment "had to have been in on a number of conversations or strategy inside [REI]" about "the Peter Voss issue" and "would probably have been present at the kinds of discussions that would let [the inspectors] know what the truth was."  Edwards Designations (Dkt. 497-1) at 310:12–16, 311:6–12.  Bray too told the investigators that (to his knowledge) Moore was unaware of the illegal payments from Gnau to Voss.  *See* PE 264 at 00394; 6/30/14 PM Tr. at 26:1 to 27:4, 32:3 to 33:2.

Notably, the inspectors never credibly contended—either during the criminal investigation or at this trial—that any of the conspirators had any reason or incentive to lie about Moore's involvement or to protect Moore.  *Cf.* 7/15/14 AM Tr. 153:20 to 156:20.  Nor did the inspectors ever seek to punish any of the conspirators for violating their plea or non-prosecution agreements.  And the inspectors never explained—then or now—how Moore could have possibly learned of the secret payments to Voss *except* through the conspirators.

Moreover, Defendants learned during their investigation that Moore and Reedy had queried Gnau as to the nature of his relationship with Voss on more than one occasion, and, each time, Gnau did not divulge the nature of the corrupt scheme, expressly denied any illegality, and stated that any payments Gnau made to Voss were loans stemming from financial problems Voss was having during his divorce.  *See* 7/15/14 AM Tr. at 43:12 to 44:9; PE 291 at SMFC4 00123.  Obviously, if Moore had been participating in a conspiracy to make illegal payments to Voss, there would have been no reason for either these questions or Gnau's answers.  Other behavior by Moore was likewise inconsistent with knowing participation in a criminal conspiracy.  If he were really part of a secret plot to steer USPS business toward REI, Moore would not have engaged in high-profile public lobbying toward the same end during the entire lifespan of his alleged involvement in the plot, *see, e.g.*, PE 65; PE 78; 6/24/14 AM Tr. at 127:10–13; 6/24/14 PM Tr. at 35:16 to 39:10), REI at Moore's direction would not have spent so much effort vetting GAI, 6/24/14 PM Tr. at 23–25; 6/30/14 AM Tr. at 45:9–12, and it would not have taken nearly six months and "repeated follow-up calls" from Voss for REI to hire GAI, PE 408 at 78; PE 51.

All of this adds up to direct and powerful evidence of Moore's innocence, and a complete absence of probable cause to charge him with knowingly joining the payoff conspiracy.  And none of the purported circumstantial evidence of guilt suffices to overcome this direct

exculpatory evidence.  At best, the government's circumstantial evidence might have allowed a

reasonable jury to conclude that Moore should have suspected something was amiss—and even

that is questionable—but that of course is not the standard for *joining* in an illegal conspiracy.

There was no evidence, even if Moore should have known or been suspicious, that he actually

knew *and* joined the conspiracy.  For example:

- Defendants strove to portray the fact of Moore's relationship with Voss, and Voss's recommendation of GAI, as nefarious on its face, but there was nothing illegal or suspicious about having a political ally in government.  The "routine cultivation" of friendship in a lobbying context … does not violate federal criminal law." *United States v. Woodward*, 149 F.3d 46, 55 (1st Cir. 1998) (internal quotation marks omitted); *REI*, 725 F. Supp. at 590 ("[there is] no … impropriety of a Governor having lunch with an officer of a company who was seeking to do business with the USPS").  As Hartman admitted post-indictment, "Voss [was an] MLOCR advocate," so Moore and "REI believed he was just acting in USPS interest" when he assisted REI.  PE 408 at 79; *see also* PE 318 at DOJ3 001609 ("Voss' subsequent support for REI, could well seem to be more a product of his publicly stated, pro-MLOCR position than of any corrupt relationship with GAI."); DX 1 at SMFC4 00006; 6/24/14 PM Tr. at 42:24 to 43:17.

- Defendants strove to portray the fact of REI's retention of GAI as nefarious on its face, but Moore and REI had investigated GAI and the firm outwardly appeared to be an established, reputable, and politically well-connected firm with other large clients and relevant expertise.  *See* 6/24/14 PM Tr. at 20:1–3, 23–25; 6/25/14 AM Tr. at 116:4 to 117:1; 6/30/14 AM Tr. at 48:8–15; 7/14/14 AM Tr. at 95:8–23.  REI's payment to GAI of a contingency fee was perfectly lawful, *see* Federal Property and Administrative Services Act of 1949, § 304(a), 41 U.S.C. § 254(a); 7/14/14 AM Tr. at 96:7–17; and REI's legal team vetted the retention and the fee, *see* 6/24/14 PM Tr. at 22:4–7; 6/30/14 AM Tr. at 46:24 to 47:4; 7/14/14 AM at 96:18–25.

- Defendants relied heavily on the fact that Moore's Postal notebook was missing pages and contained no entries for February to May 1986, but, like many lawyers, judges and executives, Moore routinely tore pages from his notebooks for innocent reasons, *see* 6/24/14 PM Tr. at 86:22 to 87:5; 6/25/14 AM Tr. at 42:18–25, as corroborated by the fact that Moore's non-Postal notebooks (produced to Defendants during the investigation) were also missing pages, *see* DX 179; DX 180; DX 181; DX 182; DX 183; DX 184; DX 185; DX 186; DX 187; DX 188; DX 190.  Further, Moore's other notebooks contain dozens of references to REI's postal procurement efforts between January and June 1986. *See* 7/14/14 AM Tr. at 32:1 to 50:2; DX 185A; DX 186A; DX 187A.

- Defendants relied heavily on the allegation that certain comments, which they plucked out of context from Moore's notebooks and other documents, were indicative of guilt. Not only is this contention inconsistent with the allegation that Moore purged his notebooks of incriminating evidence, but the highlighted statements all reflect perfectly

innocent business considerations.  Remarkably, Defendants found evidence of Moore's involvement in the payoff scheme in a notebook entry discussing standards of proof in a criminal trial, 6/25/14 AM Tr. at 155:7 to 156:6, even though the entry makes clear that the notes relate to an unidentified individual charged with "'delivery' of 200 ounces of amphetamines." DX 182 at 307989.  Defendants also purported to find evidence of Moore's involvement in the scheme in the handwritten note that it is "[t]ough to get business without payoffs," DX 186 at 308196; 6/25/14 AM Tr. at 170:1 to 171:6; 7/18/14 Tr. at 150:5–19, even though it is would have been obvious to any fair and unbiased investigator that this entry refers to the difficulties that companies have doing business in certain foreign markets like China, see DX 186 at 308195–97.  Other cited comments that at least have something to do with the USPS procurement are similarly innocuous on their face.  For instance: (i) Moore's remark that GAI was "wired" (DX 183 at 308625; 7/11/14 AM Tr. at 84:4–16) simply indicates that GAI was politically well-connected and that Gnau was a political acquaintance of Voss; Hartman admitted post-indictment that "[j]ust because consultant is wired doesn't mean there is bribery," PE 408 at 79; 7/11/14 PM Tr. at 37:22 to 38: 7; (ii) Moore's note about having a "broad scale association with John Knau [sic]" (6/25/14 AM Tr. at 89:8–10) shows nothing more than Voss's recommendation of GAI; (iii) Moore's note that "the business to be had here is substantial" is an innocent factual statement reflective of REI's pursuit of a valuable contract, see 7/11/14 AM Tr. at 77:8–15; 6/25/14 AM Tr. at 89:11–20; and (iv) Reedy's statement to Moore about REI's "controlled and channeled selling through Marcus and the Board of Governors" merely describes exactly what REI was doing (promoting REI's product) in the form of BOG meetings and presentations, whether or not there was any conspiracy, see 7/11/14 AM Tr. at 63:19 to 64:10.

- Defendants say they considered it suspicious that members of the REI board of directors did not know that Voss had recommended GAI, see 7/11/14 AM Tr. at 55:17 to 56:22; 7/15/14 AM Tr. at 103:7–16, but handwritten notes from the inspectors' February 1987 interview with REI director Israel Sheinberg specifically state that "RWR [Reedy] told IS [Sheinberg] that Voss recommended GAI," PE 235 at SMFC3 02725, as confirmed by Sheinberg's grand-jury testimony, see PE 542 at 41:18 to 43:23.  See also 6/24/14 PM Tr. at 23:1–8; PE 541 at 15:15 to 16:4, 24:25 to 25:7.

- Defendants relied heavily on Moore's alleged non-verbal assent to an alleged false answer by Reedy to an alleged question about communicating with individual members of the Board of Governors (asked after Reedy had met with Voss in a Dallas restaurant). See PE 105 at SMFC3 00195; 7/10/14 PM Tr. at 56:12 to 58:23; 7/14/14 PM Tr. at 25:19 to 27:14.  Moore credibly denied affirming any false statement, see 6/24/14 PM Tr. at 86:11; 6/25/14 AM Tr. at 121:21 to 122:8, 122:19–21, 122:25 to 123:2, 124:13–15, and the inspectors' contemporaneous notes make no reference to any nod or other assent by Moore, see PE 105 at SMFC3 00210; DX 52 at DOJ6 000594.  Moreover, a careful reading of the contemporaneous descriptions of the question to Reedy (which is never quoted) shows that the question was—or would most reasonably have been understood as—asking whether Moore, Reedy, and Bray had *all three together* spoken to any individual Board member *in connection with* any of the three *formal meetings* that REI had with the multi-member Board (or its Technology Committee). PE 105 at SMFC3 00195; see also id. at SMFC3 00210; DX 52 at DOJ6 000594.  The inspectors'

alternative narrative conflicts with this documentary evidence, and they have described the question and Moore's supposed response inconsistently and with varying degrees of confidence that have tended to build over time. *Compare* PE 105 at SMFC3 00210; DX 52 at DOJ6 000594, *with* PE 105 at SMFC3 00195, *with* 7/16/14 PM Tr. at 98:8, *with* DX 54 at SMFC4 00342; DX 1 at SMFC4 00017, *with* DX 2 at SMFC3 00017.

- Defendants pointed to Moore's alleged refusal to be interviewed (after he had already been interviewed twice), but a target of a criminal investigation has an absolute constitutional right under the Fifth Amendment to remain silent and not participate in interview with, or give statements to, investigators or prosecutors. No inference of probable cause could have legitimately been drawn from this fact.

- Defendants relied on Moore's alleged efforts to have Carlin replaced with Casey as Postmaster General and to split the procurement contracts with AEG, but this was all protected First Amendment activity, not evidence of a crime, *see supra* pp. 35–36; *REI*, 725 F. Supp. at 600; PE 311 at 9, and none of it was evidence that Moore had agreed to payoffs to Voss. Moreover, Moore could not have been conspiring with Spartin to mislead the USPS about Spartin's dual roles at MSL and GAI, because Spartin had no legal duty to disclose this conflict of interest, *see Chiarella v. United States*, 445 U.S. 222, 228 (1980), and, in any event, Spartin's dual role was widely known to USPS officials, *see* PE 55; 7/7/14 PM Tr. at 20:16 to 22:3, and open and notorious to the world, *see REI*, 725 F. Supp. at 597. Nor was there any reliable evidence of Moore's involvement in Spartin's later efforts to cover up his conflict. PE 318 at 11–12 ("Moore's subsequent conduct is inconsistent with [claims he agreed to a cover-up]").

- Moore's alleged receipt of confidential information from Voss was not evidence of Moore's involvement in the payoff scheme because there was no reason for Moore to think such disclosures illegal—they weren't—and, again, "Voss [was an] MLOCR advocate," so Moore and "REI believed he was just acting in USPS interest" when he assisted REI. PE 408 at 79; *see also* PE 311 at 11; PE 318 at 13–14. Nor could probable cause have been based on the supposed "theft" of the ECA brochure; this document contained no confidential information (it was publicly disclosed during congressional testimony) and there was no evidence Moore received it. PE 318 at 8, 13.

In sum, Defendants' circumstantial "evidence" of Moore's guilt, viewed in the context of the powerful exculpatory evidence of Moore's innocence, was legally insufficient to give rise to an inference of probable cause that Moore knew of and joined the payoff conspiracy. At a minimum, the jury's contrary conclusion is against the great weight of the evidence.

## CONCLUSION

For the foregoing reasons, the Court should order a new trial.

Dated:  August 18, 2014                              Respectfully submitted,

Amy E. Dias (D.C. Bar No. 1002623)
Christian G. Vergonis (D.C. Bar No. 483293)
Charles T. Kotuby, Jr. (D.C. Bar No. 492416)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
(T) 202.879.3939
(F) 202.626.1700

/s/ Christian G. Vergonis
Paul M. Pohl (admitted *pro hac vice*)
JONES DAY
One Mellon Bank Center
500 Grant Street, Suite 4500
Pittsburgh, PA  15219
(T) 412.391.3939
(F) 412.394.7959

Richard H. Deane Jr. (admitted *pro hac vice*)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3053
(T) 404.581.8502
(F) 404.581.8330

*Attorneys for Plaintiff*