UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM G. MOORE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 92-2288 (BAH) |
| v. | ) | (Consolidated with Civil Action |
| | ) | No. 93-0324 (BAH)) |
| | ) | |
| MICHAEL HARTMAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| WILLIAM G. MOORE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 93-0324 (BAH) |
| | ) | (Consolidated with Civil Action |
| v. | ) | No. 92-2288 (BAH)) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A NEW TRIAL

JOYCE R. BRANDA
Acting Assistant Attorney General

RUPA BHATTACHARYYA
Director, Torts Branch, Civil Division

ANDREA W. McCARTHY
RICHARD MONTAGUE
Senior Trial Counsel

JAMES G. BARTOLOTTO
LINDA Y. CHENG
KELLY HEIDRICH
REGINALD M. SKINNER
PAUL E. WERNER
Trial Attorneys, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-3111
Fax: (202) 616-4314

*Attorneys for the Defendants*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ............................................................................................................... 1

I.     MOORE FAILS TO DEMONSTRATE ANY PREJUDICIAL ERROR IN THE TRIAL PROCEEDINGS. ................................................................................................ 2

   A.   The Court Properly Excluded Evidence of Indemnification........................................ 2

   B.   The Court Properly Exercised Its Discretion in Allocating the Number of Peremptory Strikes. 5

   C.   The Court Properly Declined to Give an Instruction on Concerted Action............................. 6

   D.   The Court Did Not Admit Hearsay Evidence, and It Properly Refused to Give Moore's Overbroad and Untimely Instruction. ...................................................... 9

   E.   The Court Properly Instructed the Jury on the Probable Cause Element. ............................... 13

   F.   The Court Properly Excluded Evidence of Prior Judicial Statements and Findings of Fact. ... 16

   G.   The Court Properly Instructed the Jury on the Inducement Element........................................ 17

   H.   Testimony Regarding the Dallas Country Club's Race-Based Admissions was Volunteered by Moore's Own Witness During Proper Cross-Examination. ...................................................... 22

   I.   The Court Properly and Impartially Conducted the Trial Proceedings.. ................................. 25

II.   THE WEIGHT OF THE EVIDENCE IS FIRMLY BEHIND THE JURY'S VERDICT............ 28

   A.   The Jury's Verdict on Retaliatory Motive Is Not Against the Weight of the Evidence. .......... 29

   B.   The Jury's Verdict on Inducement Is Not Against the Weight of the Evidence...................... 32

   C.   The Jury's Verdict on Probable Cause Is Not Against the Weight of the Evidence. ............... 36

      i.   The start of the criminal investigation. ................................................................. 36

      ii.   Efforts to conceal contacts with Voss.................................................................. 36

      iii.   The hiring of GAI ............................................................................................ 38

      iv.   The firing of Paul Carlin. ................................................................................. 39

      v.   Uncovering the conspiracy. .............................................................................. 40

      vi.   Evidence of a cover-up and purging of files. ........................................................ 41

      vii.   Suspicious entries in Moore's journals. ............................................................... 42

CONCLUSION.......................................................................................................... 45

## TABLE OF AUTHORITIES

<u>Cases</u>

*Anderson v. Creighton*, 483 U.S. 635 (1987) .................................................................. 3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 29

*Arthridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102 (D.D.C. 2007) .......................... 16, 30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................. 21

*Associated Elec. Co-op., Inc. v. Morton*, 507 F.2d 1167 (D.C. Cir. 1974) .................................. 29

*Athridge v. Rivas*, 421 F. Supp. 2d 140 (D.D.C. 2006) ............................................. 25

*Baker v. McCollan*, 443 U.S. 137 (1979) ................................................................ 14

*Barts v. Joyner*, 865 F.2d 1187 (11th Cir. 1989) ........................................................ 19

*Beck v. Ohio*, 379 U.S. 89 (1964) ............................................................ 14, 15, 33, 34

*Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010) ........................................ 17

*Caudle v. Dist. of Columbia*, 707 F.3d 354 (D.C. Cir. 2013) ................................ 27, 28

*Columbia Plaza Corp. v. Sec. Nat'l Bank*, 676 F.2d 780 (D.C. Cir. 1982) .................................. 29

*Costello v. United States*, 350 U.S. 359 (1956) ............................................... 11

*Czekalski v. Lahood*, 589 F.3d 449 (D.C. Cir. 2009) ................................................ 13

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977) ............................................ 18, 19

*Deng v. Sears, Roebuck & Co.*, 552 F.3d 574 (7th Cir. 2009) ................................ 44

*Dunham v. Frank's Nursery & Crafts, Inc.*, 919 F.2d 1281 (7th Cir. 1990) ................................ 6

*Faigin v. Kelly*, 184 F.3d 67 (1st Cir. 1999) .................................................... 16, 33

*Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277 (11th Cir. 2000) .......................... 12

*Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000) ........................................ 14

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ................................................................ 14

*Goldstein v. Kelleher*, 728 F.2d 32 (1st Cir. 1984) ........................................... 5, 24

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .................................................. 7

*Hanson v. Waller*, 888 F.3d 806 (11th Cir. 1989) ........................................................ 26

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...................................................... 31, 32, 34

*Hartman v. Moore*, 547 U.S. 250 (2006).................................................................. passim

*Hutchinson v. Stuckey*, 952 F.2d 1418 (D.C. Cir. 1992)............................................... 29

*Illinois v. Gates*, 462 U.S. 213 (1983) ......................................................................... 11

*Kaley v. United States*, 134 S. Ct. 1090 (2014) ........................................................... 11

*Langevine v. Dist. of Columbia*, 106 F.3d 1018 (D.C. Cir. 1997)................................... 1

*Lawson v. Trowbridge*, 153 F.3d 368 (7th Cir. 1998) ............................................... 4, 5

*Lind v. Schenley Indus., Inc.*, 278 F.2d 79 (3d Cir. 1960) (en banc) ........................... 1, 2

*Luty v. City of Saginaw*, No. 07-2035, 2009 WL 331621 (6th Cir. Feb. 10, 2009)...................... 12

*Martin v. Dist. of Columbia Metro. Police Dept.*, 812 F.2d 1425 (D.C. Cir. 1988)................. 7, 8

*McNeil v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637 (D.C. Cir. 1988) ................................ 1

*Miller v. Poretsky*, 595 F.2d 780 (D.C. Cir. 1978) ....................................................... 15

*Moore v. Hartman*, 571 F.3d 62 (2009)...................................................... 18, 19, 33

*Moore v. Hartman*, 644 F.3d 415 (D.C. Cir. 2011) ....................................... 20, 21, 23

*Moore v. Hartman*, 388 F.3d 871 (D.C. Cir. 2004) ...................................................... 29

*\*Mullen v. Bureau of Prisons*, 843 F. Supp. 2d 112 (D.D.C. 2012).................................. 3, 27, 28

*\*Muschany v. United States*, 324 U.S. 49 (1945) ................................................... 38, 42

*Nehring v. Empresa Lineas Maritimas Argentinas*, 401 F.2d 767 (5th Cir. 1968) ....................... 6

*Nipper v. Snipes*, 7 F.3d 415 (4th Cir. 1993) .......................................................... 16, 17

*Quercia v. United States*, 289 U.S. 466 (1933) ............................................................. 17

*Scott v. Dist. of Columbia*, 101 F.3d 748 (D.C. Cir. 1996)............................................. 1

*Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366 (D.C. Cir. 1997)............................... 3

*Standard Industries, Inc. v. Mobil Oil Corp.*, 475 F.2d 220 (10th Cir. 1973) ............................... 6

*Swanks v. Washington Metro. Area Transit Authority*, 179 F.3d 929 (D.C. Cir. 1999).................. 1

*Taylor v. Washington Terminal Co.*, 409 F.2d 145 (D.C. Cir. 1969) .......................................... 1, 5

*Thompson v. Int'l Assoc. of Machinists and Aerospace Workers*,
   614 F. Supp. 1002 (D.D.C. 1985) ............................................................................ 29

*Tidemann v. Nadler Golf Cart Sales*, 224 F.3d 719 (7th Cir. 2000).............................................. 6

*United States v. Baird*, 29 F.3d 647 (D.C. Cir. 1997)................................................................. 10

*United States v. Gagnon*, 373 F.3d 230 (2d Cir. 2004) ............................................................. 44

*United States v. Goldenberg*, 168 U.S. 95 (1897) ...................................................................... 6

*United States v. Lopez*, 590 F.3d 1238 (11th Cir. 2009)............................................................. 27

*United States v. Norris*, 873 F.2d 1519 (D.C. Cir. 1989) ........................................................... 26

*United States v. Ruth*, 394 F.2d 134 (3d Cir. 1968)................................................................... 15

*United States v. Stover*, 329 F.3d 859 (D.C. Cir. 2003).............................................................. 26

*United States v. Suba*, 132 F.3d 662 (11th Cir. 1998) ............................................................... 43

*United States v. Thirion*, 813 F.2d 146 (8th Cir.1987) .............................................................. 12

*\*United States v. Williams*, 504 U.S. 36 (1992) ............................................................ 14, 33, 44

*United States v. Willson*, 708 F.3d 47 (1st Cir. 2013) ............................................................... 43

*United States v. Winstead*, 74 F.3d 1313 (D.C. Cir. 1996)......................................................... 26

*Vander Zee v. Karabatsos*, 589 F.2d 723 (D.C. Cir. 1979) ........................................................ 29

*Warren v. Thompson*, 224 F.R.D. 236 (D.D.C. 2004)............................................................... 25

*Wesby v. District of Columbia*, No. 12-7127, 2014 WL 4290316  (D.C. Cir. Sept. 2, 2014) ...... 11

**Statutes**

28 U.S.C. § 1870................................................................................................................. 6

**Federal Rules**

Fed. R. Civ. P. 47(b) ................................................................................................................ 6

Fed. R. Evid. 614(b)................................................................................................................ 26

Federal Rule of Evidence 103(b) ........................................................................................... 25

Federal Rule of Evidence 614(c) ........................................................................................... 25

Rule 30(b)(6) of the Federal Rules of Civil Procedure.................................................................. 2

**Other Authorities**

11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2805 (3d ed. 2012) ... 2

Cleary, McCormick on Evidence § 57 (3d ed. 1984) .................................................................. 10

Restatement (Second) of Torts, § 662............................................................................................ 14

## PRELIMINARY STATEMENT

After a 23-year legal odyssey, this case came to trial between June 23 and July 21, 2014.
And after a four-week trial, a jury of citizens rejected Moore's allegations on every element of
his *Bivens* retaliatory prosecution claim. Dissatisfied, Moore now moves for a new trial, faulting
the Court for various legal and evidentiary errors and basically insisting that his evidence was so
irresistibly good that the jury was required to find for him. Moore received a fair trial, and his
claims of error are either baseless or insufficient to warrant the extraordinary step of a retrial.
The jury's verdict was correct and well within its province. "[I]t is long settled that 'the jury's
verdict will withstand challenge unless the evidence and all reasonable inferences that can be
drawn therefrom are so one-sided that reasonable men and women could not disagree on the
verdict.'" *Swanks v. Washington Metro. Area Transit Authority*, 179 F.3d 929, 933 (D.C. Cir.
1999) (quoting *Scott v. Dist. of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996)). And "[i]n this
jurisdiction particularly, District Court judges have given great weight to jury verdicts." *Taylor v.
Washington Terminal Co*., 409 F.2d 145, 148-49 (D.C. Cir. 1969).

## ARGUMENT

Motions for a new trial are addressed to the trial court's sound exercise of discretion. *See
McNeil v. Hi-Lo Powered Scaffolding, Inc*., 836 F.2d 637, 646 (D.C. Cir. 1988). But the scope of
that discretion is quite narrow where, as here, the loser asks the trial judge to upset the jury's
verdict. *See Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997). Likewise,
when the motion rests on the ground that the verdict is against the weight of the evidence, the
court must take special care not to usurp the jury's role. *See id*. (citing *Lind v. Schenley Indus.,
Inc*., 278 F.2d 79, 90 (3d Cir. 1960) (en banc)). "[W]hen a jury's verdict is supported by
sufficient evidence, . . . [t]he trial court's contrary view of the credibility of the witnesses does

not justify the granting of a new trial." *Id.* (citation and internal quotations omitted, brackets

original). Furthermore, a new trial is almost never justified "on grounds not called to the court's

attention during the trial unless the error was so fundamental that gross injustice would result."

11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2805, at 73 (3d ed.

2012). Here, the jury rejected Moore's case on every element of his claim, including the

credibility-sensitive issue of retaliatory intent. For that reason and others detailed below,

Moore's motion does not come close to meeting the new-trial standard.

I.      **MOORE FAILS TO DEMONSTRATE ANY PREJUDICIAL ERROR IN THE
        TRIAL PROCEEDINGS.**

        A.      **The Court Properly Excluded Evidence of Indemnification.**

        In Moore's view, the Court erred in its pretrial ruling that "indemnification evidence will

only be permitted in response to any evidence relating to the defendant postal inspectors'

financial inability to pay an adverse judgment when and if they open the door to that." 6/17/14

Tr. at 178:4-9. As Moore sees it, a 1999 law review article opining that government

indemnification is "a virtual certainty," s*ee* Cornelia Pillard, *Taking Fiction Seriously: The

Strange Results of Public Officials' Individual Liability Under Bivens*, 88 Geo. L. J. 65, 77

(1999), is proof that no individual federal defendant will ever bear personal financial

responsibility for an adverse judgment.[1] According to Moore, this supposed assurance of

---

[1] Fifteen years after its publication, this article remains the sole support for Moore's contention
that *Bivens* defendants are universally indemnified. Moore does not explain why the article and
its contents are not hearsay or through whose testimony it would have been admitted. The article
paraphrases a discussion with Helene Goldberg, a former Department of Justice employee who
served as the government's representative in a deposition taken under Rule 30(b)(6) of the
Federal Rules of Civil Procedure, but that deposition was limited to the question of the factual
basis for the United States' contention that there was probable cause to prosecute Moore. Even
had Moore called her as a witness, an author's interpretation of Ms. Goldberg's out-of-court
statements regarding indemnification is in no way binding on the individual inspectors.

indemnification means that, unless specifically told the government will be footing the bill, the jury will "inevitably infer from the very nature of the case that Defendants [will] personally bear the financial burden of any judgment," Pl.'s Mot. for New Trial at 3 (Dkt. No. 511-1). This, he contends, conveys an unfair advantage because a jury might intuit that it should protect a defendant's personal assets by declining to hold that defendant liable, regardless of the plaintiff's proof.

Moore argues that personal liability under *Bivens* is not really personal and telling a jury that a suit is brought against an individual is merely "a legally accurate formalism." Pl.'s Mot. at 2. According to Moore, regardless of an agency's policies, indemnification is a certainty because a law review article says so. But it cannot reasonably be disputed that "[i]f the *Bivens* defendant is found liable, he becomes personally responsible for satisfying the judgment[]") *Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997). *See also Mullen v. Bureau of Prisons*, 843 F. Supp. 2d 112, 116 (D.D.C. 2012) ("*Bivens* actions are for damages, the payment of which a losing defendant is personally responsible.") (internal quotes omitted).

The Postal Service's indemnification guidelines effect no change to that well-established rule. The controlling polices provide that indemnification is not mandatory, is based on many factors, and is subject to the exercise of discretion and the availability of funds. *See* ELM §§ 668.22 and 668.23; ELM § 668.33. Here, as in *Anderson v. Creighton*, 483 U.S. 635, 641 n.3 (1987), Moore "could not reasonably contend that the [indemnification] programs to which [he refers] make reimbursement sufficiently certain and generally available to justify reconsideration of the balance struck in *Harlow* and subsequent cases."

Moreover, Moore has it wrong when he argues that the failure to permit evidence concerning indemnification somehow conveyed to the jury that "they should spare these retired

government officials from the potentially ruinous monetary liability that Moore sought to

impose." Pl.'s Mot. at 3. Indemnification has nothing to do with the merits of a claim. Instead,

allowing evidence of indemnification encourages a jury that finds for a plaintiff on the merits to

inflate a damages award: "In the general case courts exclude evidence of indemnification out of a

fear that it will encourage a jury to inflate its damages award because it knows the government –

not the individual defendants – is footing the bill." *Lawson v. Trowbridge*, 153 F.3d 368, 379

(7th Cir. 1998). This Court's pretrial ruling excluding evidence of indemnification unless

defendants first opened the door by claiming inability to pay a judgment was correct.

Moore also claims that the indemnification door was opened at trial and therefore the

Court should have allowed indemnification evidence. But Moore has waived any claim of error

because he withdrew his motion seeking to introduce such evidence. 7/9/14 AM Tr. at 55:14-20.

In any event, the door was never opened. The parties stipulated to the following statement, which

was read to the venire and then again to the jury: "Plaintiff William G. Moore, Jr., has brought

this action against five defendants individually who were U.S. Postal Inspectors." 6/23/14 Tr. at

37:21-23, 252:7-11. In his opening statement, Moore told the jury he was "seeking money

damages to compensate him, as the law may allow, for financial injury, reputational damage, and

related recoverable injuries that were caused to him by the action of these postal inspection

service defendants." 6/24/14, AM Tr. at 9:11-16, and that "the damage number gets beyond fifty

million and even beyond 100 million." *Id.* at 46:9-10. Moore also introduced deposition

testimony from Inspector Hartman acknowledging that he was being "sued individually." 7/7/14

AM Tr. at 18:5-7.

The individual defendants merely repeated the same information this Court and Moore

had already conveyed. In contrast to the cases on which Moore relies, the inspectors proffered no

evidence of their personal finances, net worth, or ability to pay a judgment. *See Lawson*, 153 F.3d at 378-80 ("[D]efendants made their financial weakness the centerpiece of their testimony" by presenting detailed testimony about their salaries, mortgages, assets and debts).

This Court correctly held that, unless the defendants first opened the door, permitting Moore to present indemnification evidence "would subject the jury to a flurry of largely irrelevant assertions and counter-assertions concerning who may or may not be financially harmed by a particular award and would result in an unduly generous award of damages by the jury." 6/17/14 Tr. at 177:5-11. Moore has waived any further claim of error by withdrawing his trial motion and, in any event, the defendants never opened that door. Under these circumstances, there is no basis for a finding of prejudicial error and no certainly no basis for a new trial.

**B.     The Court Properly Exercised Its Discretion in Allocating the Number of Peremptory Strikes.**

Moore argues he was prejudiced by the allocation of peremptory challenges among the parties but made no such objection at trial. Once a jury was selected, this Court asked, "Is the jury satisfactory for the plaintiff?" *See* 6/23/14 Tr. at 244:24-25. Plaintiff did not object. *See id.* at 245:1-2. Any objection to the composition of the jury or to the defendants' exercise of peremptories was therefore waived. Moreover, although Moore asserts prejudice he does not claim any member of the jury was biased and does not explain how he was prejudiced. *See Goldstein v. Kelleher*, 728 F.2d 32, 38 (1st Cir. 1984) (finding abuse of discretion in court's allocation of peremptory strikes but "before a reversal is granted, the complaining party should be able to point to some convincing indication in the record that if a further peremptory challenge had been allowed, he meant to challenge one or more jurors").

In any event, the statute governing peremptory challenges in civil cases gives courts broad discretion: "[E]ach party shall be entitled to three peremptory challenges. Several

5

defendants or several plaintiffs may be considered as a single party for the purposes of making challenges or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly." 28 U.S.C. § 1870; *see* Fed. R. Civ. P. 47(b). The statute expressly gives courts discretion to "allow additional peremptory challenges" to "several defendants" and to "permit them to be exercised separately." The plain language is unambiguous and does not require further interpretation. *See United States v. Goldenberg*, 168 U.S. 95, 102-03 (1897). Simply put, trial courts have broad discretion to allocate peremptory strikes. *See Dunham v. Frank's Nursery & Crafts, Inc.*, 919 F.2d 1281, 1287 (7th Cir. 1990). Indeed, appeals courts repeatedly have found no abuse of discretion where the trial court awards more peremptory strikes to multiple defendants than to the plaintiff. *See Tidemann v. Nadler Golf Cart Sales*, 224 F.3d 719, 725 (7th Cir. 2000); *Standard Industries, Inc. v. Mobil Oil Corp.*, 475 F.2d 220, 225 (10th Cir. 1973); *Nehring v. Empresa Lineas Maritimas Argentinas*, 401 F.2d 767, 767 (5th Cir. 1968). Accordingly, this Court properly exercised its discretion in allocating peremptory strikes and Moore's claim of error must be rejected.

     **C.**    **The Court Properly Declined to Give an Instruction on Concerted Action.[2]**

Moore argues that the Court erred by not instructing the jury on civil conspiracy. He properly pled conspiracy in his complaint, he argues, and he goes on that he presented evidence

---

[2] Moore uses the terms "concert of action" and "conspiracy" interchangeably. It is clear, however, that he means civil conspiracy, which is a form of "concerted action." *See Halberstam v. Welch*, 705 F.2d 472, 476-77 (D.C. Cir. 1983); *see, e.g.*, Pl.'s Mot. at 9 (citing Compl. ¶ 4 for allegation of conspiracy); *id.* at 12 ("referring to the possibility that the jury could have believed "that the inspectors and Valder had conspired"). Defendants address his argument in those terms.

that the defendants worked together on the investigative task force. *See* Pl.'s Mot. at 7-13. The Court did not err in declining to give the requested instruction.[3]

The D.C. Circuit has defined a civil conspiracy as "an agreement to take part in an unlawful action or a lawful action in an unlawful manner, and an overt tortious act in furtherance of the agreement that causes injury." *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983). The obvious problem with Moore's conspiracy argument is that the jury found that there was no wrongful act at all. "Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort." *Id*. at 479. Moore sued for retaliatory prosecution. The sine qua non of that constitutional tort is retaliatory intent; at least one defendant had to have it in order for Moore's prosecution to violate the First Amendment. As Justice (then Judge) Ginsburg explained for the D.C. Circuit in *Martin v. Dist. of Columbia Metro. Police Dept*., 812 F.2d 1425, 1431 (D.C. Cir. 1988):

> [T]he official actor's intent, motive, or purpose is the critical element. Defendants in this case are quite right when they describe Martin's charge that the Capitol Police 'acted unlawfully' as 'coextensive with [Martin's] allegation of unconstitutional motive, for ... only a bad motive ... could transform [defendants'] otherwise objectively lawful conduct [ i.e., their participation in arresting and initiating criminal proceedings against Martin] into unlawful conduct.

*Id*. at 1431.

But the jury here found that none of the inspectors harbored the requisite retaliatory intent. Without the intent necessary to make the inducement of criminal charges unconstitutional,

---

[3]  Moore incorrectly states that throughout this litigation "both sides treat[ed] the evidence as if it applied to all of the inspectors acting collectively." Pl.'s Mot. at 16. Defendants have consistently maintained the position that *Bivens* liability is personal and can be based solely on each defendant's own conduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). *See also* Joint Pretrial Stmt, Annex N, Defs' Proposed Jury Instructions, Nos. 1, 3, & 15 (Dkt. No. 438-14) at 2, 4, 21.

Moore could prove no "wrongful act" for which any of the inspectors could be liable, individually or on a conspiracy theory. *See id.* Vicarious liability under a civil conspiracy theory is thus beside the point. For the same reason, there could be no "meeting of the minds" to retaliate for Moore's speech because the jury found that none of those minds harbored retaliatory animus. Showing an agreement to induce criminal charges is not a substitute; at least one of the defendant inspectors had to harbor the intent necessary to make the whole enterprise unlawful.

At any rate, Moore did not present any evidence that the five inspectors struck such an agreement. The evidence unmistakably shows that the five inspectors worked on the task force at different times in the investigation. But cooperating in the discharge of official duty is hardly evidence of an agreement to take unlawful action against Moore. Moore's various examples of the inspectors' supposed conspiratorial actions do not establish otherwise.[4]

Moore argues that he could combine disparate "bad acts" by any inspector or prosecutor, invoke "conspiracy" and thus recover for a retaliatory prosecution. But the jury rejected the allegation that any of the inspectors harbored retaliatory intent. And prosecutor Valder's alleged statement to Hittinger about seeking future employment is not evidence of the inspectors' retaliatory intent. Moore argued otherwise, but the jury disagreed. *See* 7/16/14 PM Tr. at 45:17–46:24; 7/17/14 AM Tr. at 101:16–102:5; Hittinger Designations 26:23–27:14 (Dkt. No. 488-2) at 9. Likewise, Inspector McIntosh's delivery of documents to the Special Assistant to the Postmaster General, Paul Carlin, demonstrates no retaliatory motive; Carlin's pending lawsuit was against the Postal Service for wrongful termination. At most Moore points to disparate

---

[4] Most glaringly, after 23 years in which to come up with an argument, Moore still fails to explain how Inspector Robbins participated in a conspiracy simply by administering a polygraph examination that determined that Spartin was not deceptive when claiming he didn't know if anyone told Moore of the Voss payoffs.

instances of perceived "bad acts," but he fails to show a common conspiratorial intent. Moore was allowed to present all the evidence he claims supported a conspiracy instruction, and this Court found no legal basis to provide this instruction to the jury. *See* 7/17/14 PM Tr. at 19: 4-23:11. That was not error, and at any rate because the jury declined to infer from Moore's evidence that any of the inspectors harbored retaliatory intent, any error in this respect was harmless and does not warrant a retrial.

### D. The Court Did Not Admit Hearsay Evidence, and It Properly Refused to Give Moore's Overbroad and Untimely Instruction.

Moore's argument that the Court "prejudicially erred in admitting improper hearsay and then compounded that error when it denied Moore's request for a limiting instruction," Pl.'s Mot. at 13, also should be rejected. Although Moore complains of certain evidentiary rulings that (to him) "were inexplicably inconsistent," *id.* at 14, it seems clear that Moore recognizes that much, if not most, of the evidence in this complex case was admissible for some purposes if not others. *See id.* at 13. Thus, the lynchpin of his argument appears to be that the Court refused to give his requested limiting instruction. His arguments fail to warrant another trial.

To begin, in the parties' Joint Pretrial Statement, Moore expressly acknowledged that there were valid, non-hearsay uses for what he complains here was inadmissible hearsay evidence. Specifically, Moore acknowledged that:

> Memoranda, notes, and other records purporting to document the conduct of Defendants and the results of Defendants' investigation are inadmissible hearsay *to the extent introduced against Moore for the truth of the matters asserted therein….* Depending on the state of the record and the context and circumstances under which Defendants intend to introduce them, *the exhibits may be admissible for other purposes.* Plaintiff asserts hearsay objections to these materials at this time *not to seek wholesale exclusion of the exhibits*, but to reserve the right to object at trial to any improper hearsay use of such exhibits.

9

Joint Pretrial Statement (Dkt. 438-4) at 2 n.1 (emphasis added). Then, at trial, Moore made broad

use in his case in chief of many of the same materials and exhibits as to which he now raises a

hearsay objection. His use of the material should be no surprise. In his case in chief, Moore had

to shoulder the burden of proving, among other elements of his claim, retaliatory intent and the

absence of probable cause for his prosecution, and he presumably proffered this evidence for that

purpose. *Cf. Hartman*, 547 U.S. at 261 ("Demonstrating that there was no probable cause for the

underlying criminal charge will tend to reinforce the retaliation evidence and show that

retaliation was the but-for basis for instigating the prosecution, while establishing the existence

of probable cause will suggest that prosecution would have occurred even without a retaliatory

motive.").

Moore now complains that the Court permitted the inspectors to similarly rely on many

of the same materials in rebuttal of his case in chief and that the Court erred in not excluding

those materials and others of similar character. Obviously, Moore cannot rely on notes,

memoranda and out-of-court statements to prove retaliatory intent and the lack of probable cause

without opening the door to a comparable presentation from the defense. *Cf.* Cleary, McCormick

on Evidence § 57 (3d ed. 1984) ("[O]ne who induces a trial court to let down the bars to a field

of inquiry that is not competent or relevant to the issues cannot complain if his adversary is also

allowed to avail himself of the opening.") (citation and internal quotation omitted) (cited with

approval, *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1997)). The Court thus acted well

within its discretion in its evidentiary rulings on these issues, especially in this complex case

involving interwoven allegations of retaliatory intent and lack of probable cause.

In any event, Moore's arguments misconceive the probable cause inquiry and appear to

suppose that if the inspectors wished to defend on probable-cause grounds, they had to

effectively re-try Moore's criminal case as before Judge Revercomb. That is not the law. The

relevant inquiry for probable cause purposes is the reasonableness of the officer's belief in the

information on which he conducts a search, makes an arrest, or here, urges criminal charges.

Thus, hearsay may form the basis for a probable cause determination. *See Illinois v. Gates,* 462

U.S. 213, 238 (1983). It follows that officers sued for a constitutional tort that turns on lack of

probable cause may rely on out-of-court statements when those statements are offered to show

what information they had about the criminal conduct they were investigating. *Wesby v. District*

*of Columbia*, No. 12-7127, 2014 WL 4290316 at * 21 n.7 (D.C. Cir. Sept. 2, 2014). When

offered for that purpose, those materials are not impermissibly offered for the truth of the matter

asserted and properly may be admitted. *See id*. Consequently, their admission here could not

have improperly "shouldered Moore with the added burden of disproving the truth of evidence

that was never proffered for its truth. . . ." Pl.'s Mot at 18. What Moore actually complains about

is the considerable burden *Hartman* placed upon him to disprove probable cause.

  The grand jury itself was entitled to indict on the basis of what otherwise might be

hearsay evidence if offered in a criminal trial. *Costello v. United States*, 350 U.S. 359, 362-64

(1956); *see also Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014). Against that backdrop it

would be anomalous if Moore could sue for retaliatory prosecution, allege lack of probable

cause, present notes, memoranda, and out-of-court statements as evidence of "no-probable

cause," and then argue that the inspectors were required to produce more to defend against his

*Bivens* claim than what sufficed in his case in chief. It was of course open to Moore to call all of

the admitted conspirators in his quest to show an unfounded indictment. *See* Pl.'s Mot. at 18. It

was not incumbent upon the inspectors to do so; they had no burden of proof at all, and were

entitled to respond in kind to Moore's largely documentary case.

11

Similarly, the Court did not err in declining to give Moore's sweeping "curative" instruction. A litigant's request for a limiting instruction must be "specific and timely," *United States v. Thirion*, 813 F.2d 146, 155 (8th Cir.1987). As observed above, Moore did not propose a limiting instruction until after he completed his case-in-chief in which he introduced numerous memos, field notes, and witness statements. His proposed instruction was exceedingly broad; it purported to cover, in blanket fashion, all "summary statements, interview memoranda, summary charts, handwritten notes and other similar documents that were authored by the postal inspector defendants and/or Assistant U.S. Attorney Joseph Valder," Pl.'s Mot. for Limiting Instruction (Dkt. 511-2) at 1-2. Moore's instruction was not tied to any specific piece of evidence and could not easily or readily have been applied to any item of evidence admitted during the trial. The Court properly observed that such a vague, overly broad, and untimely instruction would have been hopelessly confusing to the jury, and properly rejected it. *See Thirion*, 813 F.2d at 155-56 (court did not err in refusing instruction that did not immediately follow offending testimony, and was not made with specificity identifying the specific evidence to be limited); *see also Luty v. City of Saginaw*, No. 07-2035, 2009 WL 331621, at *5 (6th Cir. Feb. 10, 2009) (refusal to give limiting instruction on hearsay was not error where party "failed to indicate which of the alleged hearsay statements warranted a limiting instruction").

Even assuming that Moore could demonstrate that he was entitled to a limiting instruction, the error was harmless because Moore "cannot show that the district court's failure to give a limiting instruction affected [his] substantial rights." *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1285 (11th Cir. 2000). Moore asserts that the Court's refusal to give a limiting instruction on hearsay "surely tainted the jury's assessment of whether there was probable cause for the prosecution, whether Defendants acted because of retaliatory motive, and whether

prosecutors would have filed the charges anyway." *Id.* at 20. He does not elaborate beyond this blanket and unsupported assertion. For that reason, and the others explained above, Moore fails to demonstrate any prejudice resulting from the Court's refusal to give a limiting instruction, and accordingly any error was harmless.

### E.    The Court Properly Instructed the Jury on the Probable Cause Element.

In relevant part, the Court instructed the jury as follows on the element of probable cause:

> Probable cause justifying the filing of criminal charges in an indictment exists so long as the facts and circumstances known to the prosecution at the time the charges were filed (together with the reasonable inferences from those facts) supported a reasonable belief that an offense had been committed and that the plaintiff committed it. Reasonable belief is an objective standard and exists if a reasonable person, considering the totality of the evidence known at the time of an indictment, could reasonably believe that a crime may have been committed and that the plaintiff committed it. Only the probability of criminal activity, not an actual showing, is the standard of probable cause.

> Although probable cause is determined by what was known to the prosecution at the time the charges were filed, the plaintiff may also show a lack of probable cause by showing that the defendants withheld material information from the prosecutor, that, as a result, the prosecutor did not have complete information when the charges were filed, and that if the prosecutor had had the complete information he would not have filed the charges.

Instructions to the Jury (Dkt. 500) at 7. "Jury instructions are proper if, when viewed as a whole, they fairly present the applicable legal principles and standards." *Czekalski v. Lahood*, 589 F.3d 449, 453 (D.C. Cir. 2009). Moore raises three criticisms of the Court's probable cause instruction, none of which have merit.

First, Moore argues that the Court should have "expressly" instructed the jury "on the need to consider the exculpatory evidence" in determining probable cause. Pl.'s Mot. at 21. Moore complains that the Court rejected his preferred language, which would have instructed the jury that the probable cause determination must be based on "all the available evidence,

including exculpatory evidence….” *Id.* at 20. For starters, Moore's proposed instruction imposes a duty on the prosecution that does not exist under the law. Since the government is not required to present exculpatory evidence to the grand jury, *see United States v. Williams*, 504 U.S. 36, 51 (1992), it follows that the determination of probable cause does not require the consideration of exculpatory evidence.

Even assuming that Moore's proposed language is legally sound, the Court's instruction was not only an accurate statement of the law,[5] but it also adequately addressed Moore's concerns. In particular, the Court instructed the jury that the determination of probable cause must be based on “the totality of the evidence,” *and* that Moore could prove lack of probable cause “by showing that the defendants withheld material information from the prosecutor, that, as a result, the prosecutor did not have complete information….” Instructions to the Jury at 7. Accordingly, the Court's refusal to more “expressly” instruct the jury regarding the supposed need to consider exculpatory evidence was not error.

Second, Moore argues that the Court should have instructed the jury “about the need for a full and fair investigation” in evaluating probable cause. Pl.'s Mot. at 22 (internal quotes omitted). There is no support in the law for Moore's proposed instruction. The determination of probable cause does not require agents “to investigate independently every claim of innocence.” *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (citing *Baker v. McCollan*, 443 U.S. 137, 145-56 (1979)). Instead, an officer has probable cause “when he discovers reasonably reliable information that the suspect has committed a crime.” *Id.* (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The jury in this case was instructed in accordance with this well-settled law.

---

[5] *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (defining probable cause as “the facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense”) (internal quotes and alteration omitted); *see also* Restatement (Second) of Torts, § 662.

Moore's request to instruct the jury about the supposed need for a "full and fair investigation" therefore amounted to no more than an attempt to insert his particular theory of the case into the probable cause instruction. The Court properly rejected it.

Third, Moore argues that the instruction should have stated that probable cause is based on "what a reasonable person must believe, not what … *these defendants* or the prosecutor personally believed." 7/17/14 AM Tr. at 188:15-23 (emphasis added). Moore concedes that the Court properly advised the jury that probable cause is "an objective standard" involving the "reasonable belief" of a "reasonable person." Pl.'s Mot. at 22. Moore complains, however, that the Court should have provided "more express direction" that the jury was not to consider the subjective beliefs of the prosecutor or postal inspectors in evaluating probable cause. *Id.* The Court's instruction accurately stated the law. Moore's criticism that the Court should have provided a more elaborate instruction does not somehow render the instruction inaccurate. "As long as a district judge's instructions are legally correct … [the judge] is not required to give them in any particular language," *Miller v. Poretsky*, 595 F.2d 780, 788 (D.C. Cir. 1978); *see also United States v. Ruth*, 394 F.2d 134, 138 (3d Cir. 1968) (jury instruction was "not erroneous simply because it did not adopt the language [counsel] preferred").

Even if Moore could show that the probable cause instruction was erroneous, the error was harmless because the jury found against him across the board—concluding not only that Moore failed to prove lack of probable cause, but also that he failed to prove retaliatory intent and inducement. Moore could not prevail unless he established all of these elements. Accordingly, even assuming that there was any error in the probable cause instruction, the error was harmless, and Moore is not entitled to relief under Rule 59.

15

**F.      The Court Properly Excluded Evidence of Prior Judicial Statements and Findings of Fact.**

Moore contends that the Court erred in excluding Judge Revercomb's decision granting his motion for judgment of acquittal at the close of his criminal trial. But "[c]ourts have consistently avoided potential jury confusion and unfair prejudice in related actions by excluding judicial findings, convictions, and similar evidence on Rule 403 grounds." *Arthridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102, 109 (D.D.C. 2007) (collecting cases). The reason is obvious: judicial decisions "present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice." *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993). Tellingly, Moore cites not one case to the contrary.

Moore argues that Judge Revercomb's opinion "was highly relevant to probable cause because it demonstrated that the government's evidence was abysmally weak. . . ." Pl.'s Mot. at 23. Again, Moore cites no authority for admitting a judicial opinion for that purpose. And, as this Court rightly observed when excluding the evidence, Judge Revercomb's statements would likely confuse the issues and mislead the jury "because his statements were made in the context of a Rule 29 judgment of acquittal, which has a legal standard different from the legal standard that the jurors must apply to the evidence in this case to determine the presence or absence of probable cause." 6/17/14 Tr. at 62:10-17. That risk was yet another sound basis for exclusion. *See Faigin v. Kelly*, 184 F.3d 67, 80 (1st Cir. 1999). Moore also argues that Judge Revercomb's decision was "highly relevant" to retaliatory intent because the decision to proceed with a "baseless" case may be evidence of retaliatory intent. That only underscores the potential for confusion. Judge Revercomb did not rule that the government proceeded with a "baseless" case in the "no-probable cause" sense relevant here; he ruled that the case the prosecutors presented at

16

trial did not establish guilt beyond a reasonable doubt. Moore cites *Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010), but that case stands only for the unremarkable proposition that malice may be inferred from lack of probable cause, *id*. at 69. It does not even come close to suggesting that malice (or retaliatory intent) is properly proved by introducing a judge's order granting an acquittal motion. Moore certainly was entitled to try to reinforce his retaliation allegations with proof of "no probable cause," *see Hartman*, 547 U.S. at 261, but he is entitled to do so only through the usual means of proof in federal court.

Moore suggests that the danger of unfair prejudice could have been neutralized by a cautionary instruction. *See* Pl.'s Mot. at 23. But those have not been thought adequate in this context. *See Nipper*, 7 F.3d at 418. "The influence of a trial judge on the jury is necessarily and properly of great weight…." *Quercia v. United States*, 289 U.S. 466, 470 (1933). As this Court explained, "from the moment they walk into the courtroom," the jurors would be told "that they must follow this Court's instructions on the law," and therefore "[p]resenting Judge Revercomb's statements regarding his findings and legal conclusions will be colored by the respect the jurors are reminded to accord *this* Court's instructions." 6/17/14 Tr. at 65:13-19 (emphasis added). Accordingly, this Court acted well within its discretion in excluding Judge Revercomb's decision.

### G.     The Court Properly Instructed the Jury on the Inducement Element.

In relevant part, the Court instructed the jury as follows on the inducement element of Moore's *Bivens* claim.

> To meet his burden on the second element—retaliatory inducement of prosecution—you must find that the plaintiff has proven by a preponderance of the evidence that each defendant acted in retaliation and also induced the prosecutor to bring the charges that would not have been initiated without the defendant's urging. There are two parts to this determination.

17

> First, you must find that the defendant you are considering acted, at least in part, with a purpose to retaliate against or deter the plaintiff's exercise of his protected First Amendment right.
>
> Second, you must find that the defendant you are considering induced the prosecutor to file criminal charges against the plaintiff, and the prosecutor would not have filed the charges without that inducement. Inducement is defined as intentionally taking an action to convince another individual to do something that he or she would not have otherwise done….

Instructions to the Jury at 6.

Moore argues that the Court erred in imposing a burden on him "to prove that the defendants 'induced the prosecutor to file criminal charges' and that 'the prosecutor would not have filed the charges without that inducement.'" Pl.'s Mot. at 23-24. He contends that a plaintiff who proves lack of probable cause, as required under *Hartman*, 547 U.S. at 250, has conclusively established the causal link between the agent's retaliatory animus and the prosecutor's decision to bring the charges. Pl.'s Mot. at 24. Moore argues that a plaintiff "need not further prove that the charges would not otherwise have been filed." *Id.* (footnote omitted).

Moore's argument fails for two reasons. First, *Hartman's* no-probable-cause rule did not supplant the separate requirement, long-established in D.C. Circuit precedents, that a plaintiff prove the defendant "induced" the prosecutor to bring criminal charges. A plaintiff shows a law enforcement officer's responsibility for "the government's bringing of the criminal prosecution," *Moore v. Hartman*, 571 F.3d 62, 65 (2009), by proving that the officer "induced" or "procured" the prosecution. *See, e.g., Dellums v. Powell*, 566 F.2d 167, 193 (D.C. Cir. 1977) ("there was evidence from which the jury could have concluded that Chief Powell had procured the filing of the informations by making misrepresentations to the prosecuting attorneys"). *Dellums* makes clear that a plaintiff fails to prove inducement "if the decision made by [the prosecutor] was

independent of any pressure or influence exerted by [the officer] and of any knowing misstatements which [the officer] may have made ….” *Id.*

The issue of “inducement” was not before the Supreme Court in *Hartman*. To the contrary, the Court was “addressing a requirement of causation,” 547 U.S. at 257 n.5, when it held that a plaintiff must allege and prove lack of probable cause in a *Bivens* action against criminal investigators for retaliatory prosecution. *Id.* at 252. Acknowledging the difficulty of showing “the requisite causation between the defendant’s retaliatory animus and the plaintiff’s injury,” *id.* at 261, the Court adopted the no-probable-cause requirement to help “bridge the gap between the nonprosecuting agent’s motive and the prosecutor’s action” and also to justify suspending “the longstanding presumption of regularity accorded to prosecutorial decisionmaking.” *Id.* at 263.

Notwithstanding its adoption of a no-probable-cause rule, *Hartman* observed that a plaintiff alleging retaliatory prosecution must still show inducement. *See id.* at 262 (“[A] plaintiff like Moore must show that the nonprosecuting official acted in retaliation, *and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging.*”) (emphasis added). The fact that *Hartman* did not dispense with the inducement element is reinforced by the Court’s citation with approval to the D.C. Circuit’s decision in *Dellums* and to *Barts v. Joyner*, 865 F.2d 1187 (11th Cir. 1989), another case discussing the inducement requirement and how inducement can be proved. *See id.* at 262-63 (citing *Dellums*, 566 F.2d at 192-93 (inducement can be shown by evidence of misrepresentations or undue influence or pressure by investigating officer); and *Barts*, 865 F.2d at 1195 (inducement shown by evidence that police unduly pressured or deceived prosecutors)).

19

Furthermore, the D.C. Circuit has not read *Hartman* to implicitly abrogate the circuit law requiring retaliatory prosecution plaintiffs to show inducement of the charges. The D.C. Circuit, even after *Hartman*, observes that a retaliatory prosecution plaintiff must prove that the officer "induced the prosecutor to bring charges that would not have been initiated with his urging." *Moore*, 644 F.3d at 425 (citing *Hartman*, 547 U.S. at 262) (internal quotes omitted). The D.C. Circuit has explained that "this requires a two-step causal showing—both retaliatory animus and actual inducement…." *Id.* Accordingly, even after *Hartman*, inducement of the charges remains a separate and distinct element that Moore had to prove in order to prevail on his *Bivens* claim, and the Court's instruction to the jury was consistent with this legal requirement.

The second defect in Moore's argument lies in his assumption that lack of probable cause alone "establishes" causation. *Hartman* did not so hold. To the contrary, the Court observed that additional proof may be necessary to establish the requisite causal nexus between the defendant's retaliatory animus and the prosecutor's decision to bring charges. *See Hartman*, 547 U.S. at 265 (explaining that lack of probable cause "*is not necessarily dispositive*: showing an absence of probable cause *may not be conclusive* that the inducement succeeded") (emphasis added). Lack of probable cause is therefore best understood as a necessary but not *sufficient* condition for proving causation.

Indeed, this case illustrates why lack of probable cause is not alone enough to establish the causal link. At trial, Moore endeavored to prove that the prosecuting attorney, Joseph Valder, pursued criminal charges against Moore for reasons wholly apart from any motivation by postal inspectors to retaliate against Moore's speech—namely, Valder's supposed desire to bolster his credentials and obtain a private law-firm job. Valder's personal ambitions would have broken the causal chain between the postal inspectors' retaliatory animus and the prosecutor's decision to

bring charges. Similarly, under Moore's theory, he could have sued any number of postal management officials on a theory of retaliatory prosecution. In Moore's view, he could have "established" causation merely by showing lack of probable cause for the indictment and pointing to some evidence from which a jury might infer the official's retaliatory intent. That cannot be the law. Indeed, it would violate the longstanding principle that officials are liable only for what they themselves do to *act* on their supposed intent. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). Accordingly, lack of probable cause is not the beginning and end of the causation inquiry. A showing of how the official acted to induce the charges is also necessary, and therefore the Court's instruction to the jury was proper.

Even assuming, however, that some aspect of the Court's inducement instruction was inaccurate, the error was harmless because Moore lost on every element of his *Bivens* claim. Moore cannot demonstrate that any error solely with respect to inducement instruction somehow tainted the jury's consideration of all other elements. In addition, Moore cannot dispute that liability would have been defeated upon a showing—regardless of which party had the burden of proof—that Moore would have been indicted anyway, independently of any retaliatory animus held by the postal inspectors. *See Hartman*, 547 U.S. at 261; *Moore v. Hartman*, 644 F.3d 415, 425 (D.C. Cir. 2011). In this case, there was overwhelming evidence that the decision to indict Moore and the other REI defendants represented the fully-informed and independent exercise of judgment by the United States Attorney. *See infra* Part II.B. For these reasons, any error with respect to the inducement instruction was harmless, and Moore is not entitled to a new trial.

**H.   Testimony Regarding the Dallas Country Club's Race-Based Admissions was Volunteered by Moore's Own Witness During Proper Cross-Examination.**

Moore claims that he was denied a fair trial because "the Court should have excluded irrelevant, inflammatory evidence about the race-based admissions of Moore's country club." Pl.'s Mot. at 26. The problem for Moore is that the evidence he now objects to was *volunteered* by Moore's own witness, Roger Staubach. Moreover, the evidence was volunteered during cross-examination on an issue that was directly relevant to Moore's claim of reputational injury— namely, the fact that Moore was admitted to the highly exclusive social club even *after* his indictment. Moore's argument is therefore without merit.

At the heart of Moore's damages claim is the theory that the indictment tarnished his reputation as a rising star in the Dallas business community. *See* Joint Pretrial Statement at 10 (claiming damages for reputational injury and embarrassment); *see also* Compl. ¶ 29 (alleging that the indictment caused "loss of reputation in and among business associates, friends, and family). To prove this theory, Moore called Roger Staubach to testify about "Moore's role in the Dallas business community pre- and post-indictment, his character and reputation." Joint Pretrial Statement at 11. Two weeks before Staubach testified, Moore volunteered during his own testimony that he was admitted to the Dallas Country Club after his indictment—a fact inconsistent with his claim that he lost standing in the Dallas business community as a result of the indictment. *See* 6/25/14 PM Tr. at 14:23–16:4.

Defense counsel highlighted this inconsistency for the jury during Staubach's cross-examination. Counsel first asked a series of questions regarding Staubach's longstanding friendship with Moore, a line of inquiry tending to show that Staubach, a former star athlete and business leader, held Moore in high esteem both before and after Moore's indictment. *See* 7/9/14 AM Tr. at 24:19–27:21. Counsel then set out to establish whether Staubach was aware that the

22

indictment did not keep Moore from gaining admission to the exclusive Dallas Country Club. Counsel began by inquiring whether Staubach was a member of the club. *Id.* at 27:22-23. Staubach immediately volunteered: "I never joined the Dallas Country Club because I wasn't crazy about its lack of allowing just the right people in there. So I didn't -- I never joined the Dallas Country Club." *Id.* at 27:24–28:2.

Moore contends that Staubach's reply "should have been the end of the matter," and that counsel should have moved on to a new topic. Pl.'s Mot. at 27. This argument is puzzling, since Moore himself acknowledges that Staubach's answer was a "vague response" to the question. *Id.* Counsel therefore did nothing inappropriate in seeking to clarify Staubach's answer by inquiring: "When you say, 'the right people,' are you talking about minorities?" 7/9/14 AM Tr. at 28:3-4. Staubach confirmed that he was. *Id.* at 28:4-5. Moore's counsel was silent and did not object. Defense counsel then asked whether Moore was a member of the Dallas Country Club, and also whether Staubach attended the "acquittal party" the club had hosted for Moore. *Id.* at 28:7-10. Moore's counsel did not object. Staubach replied that he "didn't know that" Moore was a club member, and he again volunteered: "By the way, that's changed now. I mean, through the years, that's been a -- been a thorn in my side as far as not allowing minorities to be a part of -- there's two other clubs in Dallas, too, so -- that I refused to join because of that." *Id.* at 28:11-15. Once again, plaintiff's counsel did not object. Nor was there any objection when defense counsel, in light of Staubach's initial uncertain response, inquired again whether, to Staubach's knowledge, Moore was a member of the Dallas Country Club. *Id.* at 28:19-22.

Counsel moved on to a new topic, seeking to establish that Staubach was not aware of any friends or business associates who shunned Moore after the indictment. *Id.* at 29:11–31:17. Counsel then returned to the issue of the Dallas Country Club solely to inquire whether Staubach

knew that the club thought so highly of Moore that it embraced him as a member even after his indictment. *Id.* at 31:25–32:3. At this time, Plaintiff's counsel requested a side bar and complained that defense counsel was "trying to play a race card." *Id.* at 32:3-24. Defense counsel explained that "the question that I'm laying a predicate for has nothing to do with the admission policies with respect to race. The plaintiff's own testimony was that he was admitted to the country club subsequent to the indictment. This goes to reputational harm." *Id.* at 33:2-7. The Court agreed.

> [Plaintiff's counsel has] elicited testimony from the plaintiff and from this witness about the reputational harm, his lack of standing in the community, his business standing in the community, his inability to join boards. The whole point of Mr. Staubach's testimony is to go to his reputational harm. It is totally relevant that he has been admitted to a club after the indictment came down. So the fact that it's -- the country club in Dallas that has a checkered past is now over, presented, it's totally relevant.

*Id.* at 33:16–34:1. Regarding the club's race-based admissions policy, the Court further explained that defense counsel "didn't elicit that testimony at all…. [I]t was [plaintiff's] witness who volunteered he didn't join the club and the reason why he didn't join the club." *Id.* at 34:4-14.

The record therefore makes plain the absurdity of Moore's argument that he was denied a fair trial because defense counsel "improperly suggest[ed] that Moore somehow shared or endorsed" the Dallas Country Club's admissions policy. Pl.'s Mot. at 27. Defense counsel never inquired—and Staubach never volunteered any testimony—concerning whether Moore shared, endorsed, or even *knew* about the club's controversial practice. To the extent there was ever any "inference of racism," Pl.'s Mot. at 27, it arose from testimony that Moore's own witness volunteered without any prompting by defense counsel. And, as the Court correctly observed,

24

Staubach volunteered information about the club's policy during cross-examination that was directly relevant to Moore's claim of reputational injury.

Finally, Moore fails to adequately explain why his counsel sat quietly and did not object, move to strike, or request a cautionary instruction regarding Staubach's testimony about the club's race-based admissions. Moore argues that this was unnecessary because his counsel had "unsuccessfully objected on relevance grounds to questions about Moore's Dallas Country Club membership earlier in the trial," Pl.'s Mot. at 28 n.13, and he claims that his objection was therefore preserved under Federal Rule of Evidence 103(b). That argument fails, however, because, by Moore's own hypothesis, Staubach's impromptu testimony about the club's admission policy raised an entirely different issue than the basic fact of Moore's membership in the club. Moore's failure to assert a timely objection to Staubach's testimony precludes any relief under Rule 59. *See Athridge v. Rivas*, 421 F. Supp. 2d 140, 151 (D.D.C. 2006) (party's failure to raise timely objection during trial means the "argument has been waived and it cannot be raised in a post-trial motion"); *Warren v. Thompson*, 224 F.R.D. 236, 239 (D.D.C. 2004) (new trial is almost never justified "on grounds not called to the court's attention").

## I.    The Court Properly and Impartially Conducted the Trial Proceedings.

Moore argues that the Court erred by "questioning witnesses in ways helpful to the defense," Pl.'s Mot. at 31 n.14, and by "delivering improper instructions that gave the jury the incorrect impression that Moore's counsel had done something improper." *Id.* at 29. Moore did not object to the Court's questions, even though Federal Rule of Evidence 614(c) provides that "[a] party may object to the court's calling or examining a witness either at that time or at the next opportunity when the jury is not present." Accordingly, he has waived the argument, unless

he can establish plain error. *United States v. Winstead*, 74 F.3d 1313, 1319 (D.C. Cir. 1996);

*Hanson v. Waller*, 888 F.3d 806, 813 (11th Cir. 1989).

There was no error here. "It is beyond cavil that trial judges may question witnesses."

*Winstead*, 74 F.3d at 1319. Indeed, "[j]udges enjoy broad latitude regarding the type of questions

asked and the extent of their questioning." *United States v. Stover*, 329 F.3d 859, 868 (D.C. Cir.

2003). *See also* Fed. R. Evid. 614(b). It is perfectly appropriate for the Court to explore "lines of

inquiry opened by one or the other of trial counsel," *United States v. Norris*, 873 F.2d 1519, 1526

(D.C. Cir. 1989), or to "examine a witness in order to clarify testimony." *Winstead*, 74 F.3d at

1319. Moreover, the Court instructed the jury that "[d]uring the course of the trial, I may have

asked questions of a witness, to obtain information or to bring out facts or to clarify facts. You

should not take my questions to witnesses as any indication of my opinion about how you should

determine the facts." Instructions to the Jury at 3. The Court also instructed the jury to disregard

any signs indicating its opinion of a particular witness or party. *See id.* Clearly there is no basis

for a finding of plain error.

Moore's assertion that the Court "effectively rebuked" his counsel is similarly without

basis. Moore implies that, in front of the jury, this Court asked why there had been no objections

to questions in Inspector Hartman's deposition that the Court viewed as "'so objectionable'" and

then *sua sponte* issued an instruction reminding the jury that the questions of counsel are not

evidence. Pl.'s Mot. at 31. In truth, the Court asked the question outside the presence of the jury.

*See* 7/7/14 AM Tr. at 122:4-22. The Court's subsequent instruction was unremarkable and one

that is commonly found in pattern jury instructions. *See United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009).[6] Moore, in any event, did not object to the instruction.

Moore also asserts that, after his counsel's summation, this Court improperly instructed the jury that not to decide the case on basis of "bias, emotion, sympathy or personal interest," nor "on the basis of sending a message or on the basis of any emotions." 7/18/14 Tr. at 133:12-23. This instruction was clearly proper, and Moore did not object to it. *Id.* at 133:3-7.[7] Although Moore neglects to mention it, his counsel argued for punitive damages because "[w]hen law enforcement officers go over the line, the conduct injures us all," 7/18/14 Tr. at 127:20-23 and asserted "if we can't trust our law enforcement personnel to play by the rules and not trample on First Amendment rights, then we're all in trouble." *Id.* at 127:24-128:2. These were improper "golden rule" arguments asking "jurors to place themselves in the position of a party." *Caudle v. Dist. of Columbia*, 707 F.3d 354, 359 (D.C. Cir. 2013) (internal quotes omitted). Such arguments are "universally condemned because [they encourage] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence." *Id.* As *Caudle*

---

[6]  The following excerpt illustrates the kind of questions Moore's counsel posed to Inspector Hartman during the deposition testimony presented at trial and warranted the Court's instruction:

> Q:  You can't think of a reason why four or five [postal inspectors] would have been necessary for the legitimate purpose of the meeting other than the show of force can you?
> A:  I don't know like the use of show of force.
> Q:  I don't think the jury is going to like it either. But I think that is what has happened. So can you give me any other explanation of why there were four or five [postal inspectors] there assuming there were?

July 7, 2014 AM Tr. at 55:2-9.

[7] In any event, the curative instruction essentially mirrored another instruction directing the jurors to decide the case without "influenc[e] by bias, sympathy, prejudice or public opinion." *See* Jury Instructions at 3. Plaintiff did not object to that instruction either.

explains, "all circuits that have considered the issue have held a golden rule argument improper if made with respect to damages." *Id.*

Ignoring these blatantly improper "golden rule" arguments, Moore focuses instead on his counsel's plea to the jury that with "[t]he verdict here, including the punitive damages, you have an opportunity to make a statement," *id.* at 128:16-18, and "make a big statement . . . speaking for the community and the system [as to] what kind of behavior they will, or won't, or want tolerated by law enforcement people." Moore acknowledges that *Caudle* expressly disapproves of such "send a message" arguments, Pl.'s Mot. at 30, *see also Caudle*, 707 F.3d at 361, but asserts that out-of-circuit authority permits them in punitive damages cases. *Caudle*, however, broadly held that undue sympathy and emotion should not be permitted to sway a jury's consideration of damages. 707 F.3d at 360. Moore's over-the-top exhortation that the jury should "make a big statement," 7/18/14 Tr. at 127:2, by awarding punitive damages in an amount "that will echo in the halls of the Postal Inspection Service," *id.* at 127:12-13, and that those damages "should be a number that won't just speak, it will shout that there are some tactics that are not going to be tolerated," *id.* at 127:13-16, is precisely the appeal to emotion that *Caudle* eschews. Consequently, the Court did not err in issuing a curative instruction.

## II.   THE WEIGHT OF THE EVIDENCE IS FIRMLY BEHIND THE JURY'S VERDICT.

Moore assails the jury's verdict on practically every element of his *Bivens* claim as "contrary to the great weight of the evidence," and he demands a new trial on this basis. This contention, too, must be rejected. As this Court has explained:

> Out of respect for the function of the jury as the trier of fact, an allegation on a motion for new trial that the verdict is against the weight of the evidence will generally be rejected unless it is quite clear that the jury has reached a seriously erroneous result, and the district judge finds the verdict contrary to the great weight or clear weight of the evidence.

*Thompson v. Int'l Assoc. of Machinists and Aerospace Workers*, 614 F. Supp. 1002, 1013

(D.D.C. 1985). When the "jury's verdict is supported by sufficient evidence, … the trial court's

contrary view of [that evidence] does not justify the granting of a new trial." *Hutchinson v.*

*Stuckey*, 952 F.2d 1418, 1421 (D.C. Cir. 1992) (citing *Vander Zee v. Karabatsos*, 589 F.2d 723,

729 (D.C. Cir. 1979) (internal quotes and alteration omitted). A district court's denial of a

motion for new trial on the basis that the jury's verdict is supported by the evidence will

withstand appellate review unless "there was a total absence of evidence to support the jury's

verdict." *Columbia Plaza Corp. v. Sec. Nat'l Bank*, 676 F.2d 780, 788 (D.C. Cir. 1982).

### A.     The Jury's Verdict on Retaliatory Motive Is Not Against the Weight of the Evidence.

Along with now-familiar innuendo and inaccurate statements of the record, Moore

reprises all of his old *summary-judgment* arguments along with his old favorite that he had "close

to the proverbial smoking gun" evidence of retaliatory intent. The jury heard four weeks of all of

that, and properly rejected it. None of Moore's arguments are reasons for upsetting its verdict.[8]

Moore argues that the "Arguments for Indicting the Corporation" memo "candidly cites

Moore's lobbying as the *first* justification for indicting REI." Pl.'s Mot. at 34. The jury properly

rejected this argument. For one thing, the jury heard ample evidence that, in a public corruption

investigation, it is appropriate for investigators and prosecutors to examine lobbying and related

activities in order to determine patterns of behavior, learn who might be seeking the favor of

---

[8] As an initial matter, Moore gets no traction from repeatedly citing the D.C. Circuit's decision in *Moore III*. The court in *Moore III* reviewed the summary judgment record, and construed the evidence in the light most favorable to the nonmoving party, which was *Moore*. *See Moore v. Hartman*, 388 F.3d 871 (D.C. Cir. 2004), *reversed, Hartman v. Moore*, 547 U.S. 250 (2006). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A ruling on summary judgment obviously does not settle disputed fact issues. *See Associated Elec. Co-op., Inc. v. Morton*, 507 F.2d 1167, 1178 n.20 (D.C. Cir. 1974).

government officials, and to uncover whether any legal lines were crossed. *See e.g.* 7/10/14 AM Tr. at 105:13-111:4; 7/10/14 PM Tr. at 28:25-29:10; 81:2-12, 86:20-23, 108:11-14, 110:10-112:20; DX 55 at 2; DX 235.

The jury properly could conclude that Hartman, Kormann, and the other inspectors were moved by evidence of public corruption, not an unconstitutional intent to retaliate for protected speech. The "Arguments" memo concluded that "[t]his is a case of an underlying corrupt corporate management strategy to obtain USPS business rather than the isolated and independent overzealous actions of two corporate officers." *Id.* at 110:13-17. Inspector Hartman testified that "it was not only the actions of Robert Reedy and William Moore that reflected violations of crimes; it was the corporate strategy. In other words, whatever they did, they did it to assist the corporation." *See id.* at 110:21-3. The items listed in the document supported the conclusion that this was a "*corrupt* corporate management strategy." (Emphasis added). For the same reason, the jury could (and assuredly did) properly reject Moore's spin on "Details of Offense" and his complaint that the government's investigation considered PAC contributions and interactions with members of Congress. *See* Pl.'s Mot. at 34-35. REI's money found its way into the pocket of a public official (Voss). The jury was entitled to credit the testimony of the inspectors and prosecutors from the United States Attorney's office that it was appropriate to investigate whether other officials in government might have been similarly corrupted, and to reject Moore's claim of retaliatory intent. So also for the issue of whether Moore proposed a contract split with AEG. *See* Pl.'s Mot. at 36. Whether that proposal was in fact illegal or protected conduct is really quite beside the point. Corruption was afoot and the jury properly credited the inspectors' testimony that they followed the evidence where it led. Similarly, the jury was entitled to credit the inspectors' testimony that they were not moved by any animus against Moore's speech or

30

any anti-REI bias on the part of Postal Service management. Moore derides that testimony as "glib[ ]," Pl.'s Mot. at 34, but sneers are not a substitute for a valid argument. Throughout this 23-year case, Moore has leveraged the fact that motive is the quintessential jury question in order to short-circuit the inspectors' qualified immunity defense and bring this case to trial. *See generally Harlow v. Fitzgerald*, 457 U.S. 800, 814, 817 n.29 (1982). After hearing the parties' evidence, the jury had ample grounds on which to conclude that the inspectors—career criminal investigators—pursued the investigation and charges against Moore, not because they cared so passionately about the esoteric controversy over "MLOCR" versus "SLOCR,"[9] but because a crime was committed, and they discovered evidence that Moore, Reedy, and REI deceived them about dealings with a corrupt public official. Now that the jury has spoken, there is no sound basis in law or reason to disturb its verdict. The jury heard the evidence, assessed the witnesses' credibility and decided what in truth happened and what in truth motivated the inspectors. Having considered the testimony and the nuances of motive, the jury reached a reasonable and just result and its verdict must stand.

The jury had ample reason to reject Moore's spin on the evidence. In addition to the inspectors' testimony about their objectives, the jury heard evidence supporting probable cause, including testimony from Hartman, Frank Bray and Moore himself about Moore's and Reedy's statements when interviewed by the government. From that evidence alone, the jury reasonably could have concluded that Moore and Reedy lied to Hartman and other postal inspectors about their dealings with Voss and that the inspectors pursued the investigation and prosecution for legitimate reasons. Leaving aside whether or not the inspectors actually had probable cause, evidence such as that and things like the missing pages from Moore's notebooks gave the jury

---

[9] The unwieldy acronyms refer of course to "multi-line optical character readers" and "single-line optical character readers."

ample basis on which to conclude that the inspectors did not act out of retaliatory animus. In light of all of the evidence, and having considered the testimony of the witnesses and their credibility, the jury was entitled to find—and properly did find—that Moore's case has no "smoking gun;" rather it was so much blowing smoke.

Moore's suggestion that the jury could not possibly have rejected his retaliation theory is all the more perplexing considering that Moore himself testified that the inspectors believed he was guilty. *See* 6/25/14 AM Tr. at 29:1-6. Plainly even Moore does not believe his theory that the indictment was not a good faith attempt at prosecution, but was instead a cynical attempt to punish a government critic whom the inspectors knew to be innocent. And when the plaintiff himself does not believe it, there is no reason why the jury must believe it. A retrial of Moore's baseless allegations is unwarranted to say the least.

### B.     The Jury's Verdict on Inducement Is Not Against the Weight of the Evidence.

Moore had to prove by a preponderance of the evidence that each postal inspector induced the U.S. Attorney to bring criminal charges "that would not have been initiated without the defendant's urging." Instructions to the Jury at 6. And, as the Court properly instructed the jury, "inducement" requires evidence that the defendant "intentionally [took] an action to convince another individual to do something that he or she would not have otherwise done." *Id*. There was overwhelming evidence to support the jury's finding that none of the postal inspectors induced the filing of criminal charges against Moore.

To begin with, there was abundant evidence for the jury to conclude that Norman Robbins, Pierce McIntosh, and Robert Edwards had no role whatsoever in the deliberative process leading up to Moore's indictment. The evidence is undisputed that, beyond administering a polygraph test, Inspector Robbins had no involvement in this matter. *See* 7/16/14 PM Tr. at

36:13–37:2. Robbins never met or communicated with anyone from the U.S. Attorney's Office, and therefore he never urged or attempted to convince any prosecutor to indict Moore. Inspector McIntosh left the investigative task force for another assignment in 1987, months before the extensive debates began at the U.S. Attorney's Office over whether to seek an indictment. *See* 7/16/14 AM Tr. at 23:22-25; 37:8-19. McIntosh was gone long before the first draft of the indictment was ever produced, and he had no input in drafting the indictment. *Id.* at 38:25–39:3*; see also* 7/16/14 PM Tr. at 99:1-8. McIntosh never testified before the grand jury. *See* 7/16/14 AM Tr. at 39:4-5. When McIntosh returned to the task force in November of 1988, the grand jury had already returned its indictment against Moore. *See* 7/16/14 AM Tr. at 38:15-24. Lastly, Inspector Edwards, like McIntosh, left the task force in 1987 for another assignment, months before the first draft of the indictment. *See* 7/15/14 PM Tr. at 86:23–87:5. Edwards did not participate in drafting the indictment, and indeed never saw the indictment before it became public. *Id.* at 89:6-10. Edwards did not draft any witness statements. *Id.* at 88:23-25. Nor did he testify before the grand jury. *Id.* at 89:1-2. Edwards did not attend any meetings at the U.S. Attorney's Office where prosecutors debated whether to seek an indictment of Moore. *Id.* at 89:3-4. Based on this evidence, the jury could have reasonably concluded that these inspectors had no role or influence whatsoever on the U.S. Attorney's decision to bring criminal charges against Moore.

In addition, there was substantial evidence that the U.S. Attorney would have indicted Moore anyway, independent of any alleged pressure or influence by the postal inspectors. Assistant U.S. Attorney Valder was actively involved in the criminal investigation, and he independently reached the conclusion that Moore should be indicted. *See* 7/16/14 PM Tr. at 40:24–41:18; 95:21–96:18. The postal inspectors never pressured Valder to seek an indictment.

33

*Id.* at 98:20-22. Nor was there any evidence of any postal inspector withholding or misrepresenting the facts to Valder. After Valder himself concluded that there was evidence of Moore's knowing participation in an illegal conspiracy, he drafted a proposed indictment. *Id.* at 99:1-8.

The proposed indictment received "exhaustive," "extensive," and "extraordinary" review by supervisory prosecutors in the U.S. Attorney's Office. *See* DX 87, at Bates DOJOPR 000037. Each count in the proposed indictment was analyzed and debated by a committee of no less than six Assistant U.S. Attorneys and the U.S. Attorney himself, Jay Stephens. *See* 7/2/14 AM Tr. at 110:16-25; 103:25–107:17; *see also* 7/17/14 AM Tr. at 125:19–126:6. The assembly of such a review committee was not a routine procedure, and it was also unusual for the U.S. Attorney to personally participate in making decisions about potential prosecutions. *Id.* The fact that Stephens was directly involved in reviewing the proposed indictment reflects the exceptional level of review this indictment received. *Id.*

Members of the review team met on at least seventeen occasions to discuss and evaluate the proposed indictment. *See* 7/16/14 AM Tr. at 100:7-20. Inspectors Hartman and Kormann occasionally attended these meetings, but when they did, "[t]hey weren't primary spokespersons" but "support people" who provided background information to the prosecutors if they were specifically called upon to do so. *See* 7/17/14 AM Tr. at 127:9–128:8. The postal inspectors were forthcoming with the evidence and never hid the fact that none of the coconspirators said they ever told Moore about the illegal payoffs. *See* 7/11/14 AM Tr. at 40:22-41:7. Thus, prosecutors were well aware of the fact that the evidence against Moore was entirely circumstantial. *See* 7/10/14 AM Tr. at 40:7-10, 18-21; *see also* 7/17/14 PM Tr. at 132:1-16, 136:10-22; DX 87 at 1-2. At trial, Moore focused on the review team's lone dissenter, Assistant

34

U.S. Attorney Charles Leeper, who was the least experienced prosecutor on the committee. *See* 7/2/14 AM Tr. at 101:19-102:6, 113:15-114:2. Leeper argued forcefully against the indictment. *See* 7/10/14 AM Tr. at 44:14-16. Everyone else on the committee, however, disagreed with his view that the case should not be indicted. *See* 7/2/14 AM Tr. at 101:19–102:6; 113:15–114:2.

Prosecutors also heard directly from the defense attorneys who would represent Moore and the other REI defendants at the criminal trial. In February 1988, a team of lawyers representing Moore, Robert Reedy, and REI submitted a 300-page brief and 200 pages of exhibits to the U.S. Attorney, arguing a multitude of reasons why the prosecutors should not indict. *See* DX 8. On September 22, 1988, these attorneys met face-to-face with the U.S. Attorney and other members of the review team to make their best case against the indictment. *See* 7/15/14 AM Tr. at 118:2-11; *see also* DX 81. Postal Inspectors Hartman and Kormann were present, but they did not speak. *See* 7/11/14 AM Tr. at 123:9-11; *see also* 7/15/14 AM Tr. at 122:22-23; DX 81 at 1. The postal inspectors did not attend any subsequent meetings at the U.S. Attorney's Office regarding the proposed indictment. *See* 7/11/14 AM Tr. at 123:12-16; *see also* 7/15/14 AM Tr. at 123:25-124:3. Despite counsel's best arguments, the U.S. Attorney, supported by the review committee's recommendation, decided to indict Moore, Reedy, and REI.

The review process conducted by the U.S. Attorney's Office was not tainted by any pressure or undue influence from the postal inspectors. *See* 7/10/14 AM Tr. at 45:1-8, 126:19-21; *see also* 7/16/14 PM Tr. at 98:20-22; 7/17/14 AM Tr. at 147:21-148:1. The decision to indict Moore and the other REI defendants resulted from the independent exercise of professional judgment by the U.S. Attorney after long and comprehensive debate. Accordingly, there was sufficient evidence to support the jury's verdict on inducement, and the jury's finding on this element does not justify a new trial.

**C.**  **The Jury's Verdict on Probable Cause Is Not Against the Weight of the Evidence.**

The weight of the evidence is firmly behind the jury's finding that there was probable cause to indict Moore.

### i.  The start of the criminal investigation.

The inception of the criminal investigation, its initial focus on Peter Voss (not Moore), and the guidance postal inspectors received from the Department of Justice—including prescient advice from DOJ lawyers that evidence of "gratuities will be forthcoming"—supports the jury's verdict that there was probable cause. *See* 7/10/14 AM Tr. at 48:15-17, 93:13-20, 114:23-115:12, 116:23-117:3, 117:18-23; DX 51 at 1.

### ii.  Efforts to conceal contacts with Voss.

The evidence showed that during a key interview with postal inspectors on November 20, 1985, Moore and other REI executives lied in an effort to conceal their extensive communications and relationship with Voss. When asked whether they had met or spoken individually with any member of the postal Board of Governors, Reedy said no, and Moore nodded in affirmation. *See* 6/30/14 AM Tr. at 81:23-25, 82:12-14, 83:1-11; 7/10/14 PM Tr. at 51:4-7, 51:16-24, 52:3-5, 55:12-14, 56:17–57:21, 57:18–58:10, 88:3–89:15, 92:6-21, 98:20-23, 99:13-17; 7/11/14 AM Tr. at 43:19-24, 76:16–77:15; 7/14/14 AM Tr. at 28:5-7, 115:12-17; DX 52 at 7; DX 65 at 4-5; DX 180 at Bates 308170; PE 31 at 1; PE 105 at 3. The inspectors later learned that Reedy had secretly met with Voss on September 3, 1984; that Moore was aware of and approved the meeting; and that Moore had engaged in extensive, secret communications with Voss in July, September, November, and December of 1984. *See* 7/10/14 PM Tr. at 88:10-12, 99:13-17; 7/11/14 AM Tr. at 43:19-24; 7/14/14 PM Tr. at 28:5-7, 60:19-23.

36

Likewise, Moore and Voss endeavored to conceal their relationship from officials at the Postal Service. The inspectors learned about a bizarre incident that occurred during a May 1985 meeting of the Technology and Development Committee. Senior Assistant Postmaster General James Jellison told inspectors that Moore approached Voss and said, "Peter Voss, I've heard of you," to which Voss replied, "I haven't heard of you." *See* 7/10/14 PM Tr. at 62:1-10; PE 112 at 6. This was obviously a phony "introduction," given the extensive communications that had occurred between the Moore and Voss several months prior to the meeting.

The effort to conceal Moore's contacts with Voss gave inspectors reason to be highly suspicious, since it was Voss who referred REI to John Gnau, and Voss who insistently urged Moore to hire Gnau's consulting firm. *See* 7/10/14 PM Tr. at 98:20-23; 7/11/14 AM Tr. at 76:16–77:15; 7/14/14 PM Tr. at 28:23–29:7; DX 65 at 4-5; DX 180 at Bates 308170. As Inspector Hartman testified, when individuals are untruthful about something, "especially during an investigation … it's because they typically have something to hide." 7/10/14 PM Tr. at 59:8-12. In addition, Inspector Kormann testified that it was unusual for a member of the Board of Governors to meet privately with a potential vendor on a major contract, recommend the hiring of a specific consultant, and then repeatedly follow up to confirm that REI had hired the consultant that he recommended. *See* 7/14/14 PM Tr. at 28:23–29:7; 7/15/14 AM Tr. at 41:5-10; DX 151 at 8. Indeed, the very fact that Voss was pushing GAI was strange, since GAI was a small, relatively unknown, three-man firm based in Detroit, and REI already had a large and established consulting firm, Hill & Knowlton, providing the same type of services that GAI was offering. *See* 7/14/14 AM Tr. at 92:19-24; 94:7-23.

### iii.     The hiring of GAI

The terms of the contract itself were unusual. REI agreed to pay GAI, a three-man firm

based in Detroit, $10,000 a month when it was already paying Hill & Knowlton only $5,000 a

month. *See* 7/10/14 PM Tr. at 63:19-21; 7/15/14 AM Tr. at 45:10-15, 47:10-14. REI also agreed

to pay GAI a 1% contingency fee on any contract REI obtained with the Postal Service. *See*

7/15/14 AM Tr. at 45:10-15. Inspector Hartman testified, based on his investigative experience,

that contingency fee arrangements are abnormal in the consulting industry and are cause for

concern. *See* 7/14/11 AM Tr. at 96:15-17; *see also Muschany v. United States*, 324 U.S. 49, 64

(1945) ("Contingent fee contracts to secure Government business for the employer of the

recipient have been held invalid because of their tendency to induce improper solicitation of

public officers and the exercise of political pressure."). The contingency fee would have resulted

in a $4 million payout to GAI if REI obtained an OCR contract. *See* 7/11/14 AM Tr. at 60:11–

61:12; 7/15/14 AM Tr. at 102:8-14. The inspectors also found it highly suspicious that, despite

the significant potential payout to GAI and the enormous revenue an OCR contract represented

for REI, Moore concealed this information from REI's board of directors. *See* 7/11/14 AM Tr. at

56:21-22, 57:18-22, 58:2-6, 60:1–61:12; 7/15/14 AM Tr. at 102:8-14; DX 228.

Postal inspectors later learned of a second contract, in which REI agreed to pay GAI

$22,000 a month—again, at a time when REI was paying Hill & Knowlton only $5,000 a month.

*See* 7/10/14 PM Tr. at 119:21-120:12-16; DX 151 at 14. Six thousand of this amount was

purportedly for "public relations" work; however, postal inspectors learned from Spartin that

REI never requested any public relations services under the agreement. *See id.*; *see also* 7/11/14

AM Tr. at 14:13-16; PE 137 at 13. In reference to the $6,000, Reedy told Gnau, "I know you

have people to take care of." 7/10/14 PM Tr. at 120:17-21; DX 151 at 14. Reedy made this

comment after he had asked Gnau on multiple occasions, "What is your arrangement with Peter Voss?" and Gnau had responded, "It's better you not know." 7/10/14 PM Tr. at 119:2-5; DX 151 at 12. Gnau testified to the grand jury that when he heard Reedy state "I know you have people to take care of," Gnau assumed that Reedy understood that Gnau was paying off Voss. *See* PE 210 at 10:14-12:13. Thus, it was reasonable for the inspectors to infer that Reedy's comment was evidence of Reedy's understanding that Gnau was "taking care of" Voss by illegally paying him kickbacks. *See* PE 210 at 11-12.

### iv.    The firing of Paul Carlin.

Events surrounding Paul Carlin's abrupt firing in 1986 and his replacement with Moore's longtime friend and mentor, Al Casey also support the jury's finding of probable cause. Spartin was an officer of GAI. *See* 7/10/14 PM Tr. at 64:4-5. Moore, Reedy, Gnau and Spartin all perceived Carlin as an obstacle to REI's efforts to obtain a sole-source contract. *See* 7/10/14 PM Tr. at 72:2-8, 73:1-18; 7/11/14 AM Tr. at 17:13-20; 7/14/14 AM Tr. at 131:10-18; 7/14/14 PM Tr. at 32:9-12; 7/15/14 AM Tr. at 28:2–29:12, 48:12-18; PE 137 at 25. The inspectors learned that a contract to recruit the new postmaster general had been awarded to none other than William Spartin. *See* 7/10/14 PM Tr. at 74:7-23. Inspectors obtained information revealing that REI, GAI, and Spartin had secretly discussed plans to "knock out Carlin" and install someone more favorable to REI. 7/16/14 PM Tr. at 88:19–91:2. Moore personally recommended Casey to Spartin for the position. *See* 7/11/14 AM Tr. at 15:13-21; PE 137 at 19. Carlin was summarily dismissed in January 1986 after barely a year as Postmaster General, and he was replaced by Casey. *See* 7/10/14 PM Tr. at 71:17-19, 73:22-24. After Carlin's termination, James Jellison, who had also opposed REI's effort to obtain a non-competitive contract, was also removed from his position in charge of postal operations. *See* 7/10/14 PM Tr. at 72:2-3. Moore attended a

"victory celebration" with Spartin and others where they toasted each other and celebrated getting "our man in place." *See* 7/15/14 AM Tr. at 48:3-9; DE 151 at 18. Spartin later commented to Moore that Carlin had been "destroyed as planned." *See* 7/11/14 AM Tr. at 18:7-15; PE 137 at 25. In light of these events, the inspectors reasonably suspected that the hasty removal of Carlin and Jellison was related to REI's effort to obtain a sole-source contract for OCR machines. *See* 7/10/14 PM Tr. at 71:21-24, 72:6-8.

### v.      Uncovering the conspiracy.

In February 1986, the U.S. Attorney's Office opened a grand jury investigation. *See* 7/10/14 PM Tr. at 86:20-23. Through subpoenas, postal inspectors discovered that Moore's consulting firm, GAI, was paying illegal kickbacks to Voss for assistance in obtaining a $250-400 million OCR contract. *See* 7/10/14 PM Tr. at 87:21-23; 97:19-22; PE 165 at 10-12. In April 1986, Spartin agreed to cooperate with the investigation and confirmed to postal inspectors that it was Voss who had recommended that Moore hire GAI. *See* 7/10/14 PM Tr. at 93:11-13, 95:25–96:4; DX 56 at 2.

On April 8, 1986, the day after interviewing Spartin, postal inspectors interviewed Reedy and Bray at REI headquarters. *See* 7/10/14 PM Tr. at 97:23–98:5. When inspectors asked them who the source of the GAI referral was, they lied in an effort to conceal the fact that the recommendation had come from Voss. *See* 6/30/14 PM Tr. at 42:2-10; 7/10/14 PM Tr. at 98:13-20; DX 2 at Bates SMFC3 00027, SMFC3 00085.

Voss, Gnau, and Marcus pled guilty to felonies in connection with the payment of illegal kickbacks to Voss, and Spartin received immunity. *See* 7/10/14 PM Tr. at 93:11-13, 99:24–100:9; PE 165 at 2. Moore's close relationship with these admitted felons, the efforts to conceal

his contacts with Voss, and the fundamental fact that the conspiracy's goal was to obtain a $250-400 million dollar contract for REI, all support the jury's finding of probable cause.

### vi.    Evidence of a cover-up and purging of files.

The inspectors learned from multiple sources that, as the investigation gained momentum, Moore and Spartin agreed to a cover-up to conceal the fact that Moore had recommended Casey to Spartin. *See* 7/10/14 PM Tr. at 121:16-20; 7/11/14 AM Tr. at 8:17-25, 25:16–26:7, 37:3-10, 38:18-23; DX 65 at 16; PE 137 at 27; DX 151 at 21; DX 154 at 22; DX 175 at 2-3.

In addition, Marcus told postal inspectors that Moore, Voss, Reedy, Spartin, and Gnau had agreed to purge their files. *See* 7/11/14 AM Tr. at 37:3-10, 38:18-23; DX 154 at 22. Marcus's statement was corroborated by evidence the inspectors uncovered during the investigation. In particular, the inspectors obtained Moore's "Postal" notebook, which was missing 36 out of 80 sheets. *See* 7/11/14 AM Tr. at 93:20–94:6; DX 192 at Bates 036241;

It was also strange that, although Moore's Postal notebook contained entries dated from September 1985 through January 6, 1986, it had no dated entries for the rest of January through May 1986. *See* 7/11/14 AM Tr. at 94:20-96:17. A series of crucial events related to the OCR procurement occurred between January 6, 1986 and May 1986:

- Casey was appointed PMG on January 7, 1986;

- Moore attended the "victory celebration" in Washington, D.C. on January 9, 1986;

- Moore and Reedy met with Spartin in Washington, D.C. in February 1986;

- the Board of Governors confronted Spartin concerning his conflict of interest in March 1986;

- the inspectors interviewed Reedy and Bray and served grand jury subpoenas on REI in April 1986;

41

- Voss pled guilty to accepting illegal kickbacks in May 1986; and

- the coconspirators collaborated in an attempt to align their stories.

*See* 7/11/14 AM Tr. at 97:13–98:21; 7/14/14 PM Tr. at 77:19-25.

Postal inspectors also discovered that one of Moore's telephone logs, which recorded his telephone messages, was missing. *See* 7/11/14 AM Tr. at 64:16–65:1; 7/14/14 PM Tr. at 67:25–68:8. This missing log covered the period from October through December 1984. *Id.* Additionally, Moore's telephone toll records from November and December 1984 were missing. *Id.* This was the very point in time when Voss was aggressively pushing Moore to hire GAI.

This evidence—including, the significant number of missing pages in Moore's "Postal" notebook, the absence of any dated entries in Moore's notebook for the critical time period of January 7, 1986 through May 1986, and the missing telephone logs and phone records—supported the postal inspectors' reasonable (and growing) suspicion of Moore's participation in the illegal conspiracy.

### vii.    Suspicious entries in Moore's journals.

Moore's notebooks contained several entries that the inspectors' reasonably believed were evidence of his knowing participation in the conspiracy.

- Moore's May 1984 journal contained a July 26, 1984 entry stating: "Notify USPS that we're getting out of the business." 7/11/14 AM Tr. at 74:7–75:9; DX 179 at Bates 307807. This entry, viewed in the light of REI's rapid and stunning reversal of fortune once it hired GAI (at Voss's urging), reasonably suggested that GAI's ability to open doors for REI was through improper means.

- The inspectors found an entry dated April 29, 1985, in which Moore wrote, "consultant – wired (Peter Voss)." 7/11/14 AM Tr. at 84:7-85:2; DX 183 at Bates 308625. Moore's telephone messages for that same day revealed a call and message from Spartin, stating "[Moore] would know his name and the reason for [Spartin's] call." 7/11/14 AM Tr. at 85:21-25; DX 172. The inspectors could have reasonably interpreted this entry as evidence of Moore's understanding that GAI was connected (or "wired" in) to Voss, the corrupt postal Governor.

42

- Inspectors also found an entry in Moore's April 1986 notebook stating: "Respond to USPS inspectors. Somebody is cooperating. What do we know about Bill Spartin." 7/14/14 PM Tr. at 98:21-22; DX 186 at Bates 308263. This was the same time period during which a grand jury investigation had opened and Spartin had received immunity.

- The inspectors found the following entries in Moore's November 1986 notebook: "lot of homework," "drive a wedge between people (intimidate)," "answer 'I don't know, I really can't remember,'" "don't show him how smart you are," "don't relax." 7/14/14 PM Tr. at 99:21-100:4; DX 190 at Bates 602738. Moore wrote these entries in his notebook shortly before the inspectors were scheduled to visit REI for the purpose of interviewing REI employees in connection with the criminal investigation. 7/14/14 PM Tr. at 99:25–100:2, 100:7-17; DX 190 at Bates 602737.Notably, Moore's notes did not contain anything remotely resembling "tell the truth." A reasonable officer could have interpreted these entries as evidence of an attempt to evade the truth and hinder the investigation, which is consistent with Moore's conduct during the November 20, 1985 interview.

- The inspectors found an entry from February 1987, after Marcus had already pled guilty, stating: "Marcus—go see him. Need reference account!" 6/25/14 AM Tr. at 183:7-14; DX 190 at Bates 602754-56. A reasonable officer could find it highly suspicious that Moore urgently needed to "go see" a convicted felon and obtain the "reference account." The entry was particularly troubling in light of evidence that Moore and Reedy had repeatedly lied to postal inspectors in an effort to conceal the fact that Voss was the source of the GAI referral.

In addition to the above notebook entries that were suspicious on their face, postal inspectors also found entries in Moore's notebooks that reflected the internal deliberations of closed Board of Governors meetings. *See* 7/11/14 AM Tr. at 79:12-80:12, 83:9-18, 99:20–100:2; DX 184 at Bates 308482, 308586; DX 185 at Bates 307722; DX 192 at Bates 036283.

At trial, Moore emphasized that none of the coconspirators said they told Moore about conspiracy. However, they all told inspectors that Moore *must* have known about it. *See* 7/15/14 AM Tr. at 104:6-105:1. In any event, the lack of direct evidence of Moore's knowledge about the conspiracy does not negate probable cause. *See United States v. Suba*, 132 F.3d 662, 674 (11th Cir. 1998) ("Guilty knowledge can rarely be established by direct evidence, especially in respect to fraud crimes which, by their very nature, often yield little in the way of direct proof."). Moreover, "[a] conspiracy may be based on a tacit agreement shown from an implicit working

relationship." *United States v. Willson*, 708 F.3d 47, 54 (1st Cir. 2013) (internal quotes and citation omitted).

Moore contends that all the above facts have innocent explanations that the inspectors simply ignored. Moore's argument, however, conflates his defenses to the criminal charges with the distinct question of whether the government had probable cause to seek an indictment and bring a case to trial in the first place. "A person's ability to explain away seemingly damning facts does not negate the existence of probable cause, even though it might provide a good defense should the case go to trial." *Deng v. Sears, Roebuck & Co.*, 552 F.3d 574, 577 (7th Cir. 2009); *see also United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) ("[T]he fact that an innocent explanation may be consistent with the facts as alleged does not negate probable cause."). Probable cause is established so long as the reasonable inferences from the evidence support a belief in guilt. *See Williams*, 504 U.S. at 51 ("It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge.").

The evidence uncovered by the inspectors, considered as a whole, provided a substantial basis for the jury to find that the government had probable cause to indict Moore. Presented with all the evidence, and given the opportunity to judge the demeanor and credibility of the witnesses, a fair-minded jury could (and did) conclude that there was probable cause. Therefore, Moore's challenge to the jury's verdict on probable cause fails.

**CONCLUSION**

For the foregoing reasons, the Court should deny Moore's motion for a new trial.

Dated: September 29, 2014                Respectfully submitted,

                                         JOYCE R. BRANDA
                                         Acting Assistant Attorney General

                                         RUPA BHATTACHARYYA
                                         Director, Torts Branch, Civil Division

                                         ANDREA W. McCARTHY
                                         RICHARD MONTAGUE
                                         Senior Trial Counsel

                                         By: /s/ Reginald M. Skinner
                                         JAMES G. BARTOLOTTO
                                         LINDA Y. CHENG
                                         KELLY HEIDRICH
                                         REGINALD M. SKINNER
                                         PAUL E. WERNER
                                         Trial Attorneys, Civil Division
                                         United States Department of Justice
                                         P.O. Box 7146, Ben Franklin Station
                                         Washington, D.C. 20044
                                         Tel: (202) 616-3111
                                         Fax: (202) 616-4314

                                         *Attorneys for the Defendants*